T.C. Memo. 2003-185

UNITED STATES TAX COURT

PAUL AND PAULINE D. KESSLER, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 3281-02.                    Filed June 26, 2003.

Paul and Pauline D. Kessler, pro sese.

<u>James N. Beyer</u>, for respondent.

MEMORANDUM OPINION

RUWE, <u>Judge</u>:  This case was submitted fully stipulated.  The
stipulation of facts, the supplemental stipulation of facts, and
the stipulation of settled issues are incorporated herein by this
reference.

On November 9, 2001, respondent issued a notice of deficiency determining petitioners owed income tax deficiencies of $17,097, $17,283, and $11,267 for the taxable years 1991, 1992, and 1993, respectively. Additionally, respondent determined a $2,765 accuracy-related penalty pursuant to section 6662(a) for the tax year 1991.[1]

In the notice of deficiency, respondent made numerous changes to items reported on petitioners' returns for the aforementioned years. After petitioners' concessions,[2] the issues to be decided are: (1) Whether petitioners' rental losses for the taxable years 1991, 1992, and 1993 in the amounts of $115,390, $48,974, and $21,309, respectively, are section 469 passive activity losses, and (2) whether petitioners are liable for the section 6662(a) accuracy-related penalty for 1991.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]Petitioners conceded the following: (1) They had unreported rental income in 1991 of $55,000 which should have been included on their Schedule E, Supplemental Income and Loss; (2) their total claimed depreciation deductions should be decreased by $1,590, $15,005, and $22,005 for 1991, 1992, and 1993, respectively; and (3) they had additional unreported capital gains of $1,464 for 1992.

Background

Petitioners timely filed their joint income tax returns for 1991, 1992, and 1993. Petitioners were owners[3] and operators of a subchapter C corporation named Pauline's Concrete Pumping, Inc.[4] (Pauline's Concrete). At the time the petition was filed, petitioners resided in Philadelphia, Pennsylvania.

On February 15, 1987, petitioners in their individual capacities entered into a "Master Lease Agreement" with Pauline's Concrete (the lease). The lease contemplated that petitioners would provide certain equipment to Pauline's Concrete and that Pauline's Concrete was responsible for all costs, including the costs associated with the acquisition and maintenance of the equipment and for all the insurance costs. The lease term was 10 years. Attached to the lease was an exhibit which listed the following equipment contemplated by the lease:

---

[3]For the taxable years at issue, petitioners were the only shareholders of Pauline's Concrete Pumping, Inc.

[4]The stipulations filed by the parties use the names "Pauline's Concrete Pumping, Company," "Pauline's Concrete Pumping Company, Inc.," and "Pauline's Concrete Pumping Inc." It is apparent that the stipulations refer to the same entity.

| Truck Description | Unit Number |
|---|---|
| Mack 175K | 1 |
| Mack 514K | 2 |
| Mack 474K | 3 |
| Tag along | 4 |
| 1989 Ford truck | |
| 1993 Ford truck | |
| Various excavation equipment | |
| Office equipment | |

In exchange, Pauline's Concrete covenanted to pay petitioners for the use of the equipment.[5]

For the taxable years 1991 through 1993, Pauline's Concrete was generally in the business of performing concrete pumping. Pauline's Concrete provided concrete pumping services and related equipment at specific locations as requested by the construction contractors.[6] For the years at issue, both petitioners worked for, and received wages from, Pauline's Concrete. Petitioners each drove and operated the equipment leased by Pauline's

---

[5]The lease states:

The lease payments (the "Annual Lease Amount") shall be calculated annually by Lessor based upon the number of hours the trucks are in operation for the year at a rate of $120 per hour, however, monthly payments (the "Periodic Payment") shall be paid in an amount as from time to time may be periodically agreed between Lessor and Lessee. * * *

[6]As part of its operations, Pauline's Concrete performed, among other things, the following: Receiving phone calls to log the pumping equipment on and off jobsites; deciding which pumping equipment will be placed on which jobs; transporting the pumping equipment to the jobsites; deciding when to replace older pumping equipment; performing necessary maintenance on the pumping equipment; and performing the safe operation of the pumping equipment.

Concrete at various jobsites.[7]  Petitioners were both responsible for the management and daily operations of Pauline's Concrete.[8]

During the years at issue, petitioners were also employed by the same construction contractors for whom Pauline's Concrete performed concrete pumping services.  These services consisted of providing and operating equipment which would pump concrete to the specific locations needed by the customers as part of the construction process.  The parties stipulated: "This payment arrangement was used in order for petitioners to maintain their union membership in the union, but more importantly to the petitioners, to get paid for the services they performed."  The contractors issued Forms W-2, Wage and Tax Statement, to report payments made to petitioners in their individual capacities.[9]

For 1991, 1992, and 1993, petitioners reported their lease activities on Schedules E, Supplemental Income and Loss, attached to their joint income tax returns, on which they reported net losses of $171,980, $63,979, and $43,314, respectively.  For 1991, 1992, and 1993, petitioners received rental income under

---

[7]Pauline's Concrete employed approximately four to six additional employees who also operated the leased equipment.

[8]Additionally, petitioner Pauline Kessler performed administrative, clerical, and secretarial duties for Pauline's Concrete.

[9]Petitioners, in their individual capacities, received 20 to 30 Forms W-2, Wage and Tax Statement, each year from contractors.

the lease agreement in the amounts of $55,000,[10] $108,000, and $184,702, respectively. With respect to the leasing activity, for 1991 and 1992, petitioners claimed only equipment depreciation deductions of $171,980 and $171,979, respectively. With respect to their leasing activity, for 1993, petitioners claimed deductions for interest expense and depreciation of $44,538 and $183,478, respectively.

Discussion

Determinations of the Commissioner in a notice of deficiency are presumed correct, and the burden is on the taxpayer to show that the determinations are erroneous.[11] Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). As a general matter, deductions are a matter of legislative grace, and the taxpayer bears the burden of proving entitlement to such claimed deductions. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).

1. Were Petitioners' Rental Activities Passive Activities?

Section 469(a)(1) limits the deductibility of losses from activities which are deemed "passive" activities. A passive

---

[10]See supra note 2. On their 1991 return, petitioners reported no lease income.

[11]Sec. 7491, which shifts the burden of proof to respondent in certain circumstances, does not apply because the examination of the returns at issue commenced prior to the statute's effective date.

activity is broadly defined as any activity involving the conduct
of a trade or business in which the taxpayer does not "materially
participate".  Sec. 469(c)(1).  Rental activities are
presumptively passive activities, regardless of whether the
taxpayer materially participates.  Sec. 469(c)(2), (4); Tarakci
v. Commissioner, T.C. Memo. 2000-358; Frank v. Commissioner, T.C.
Memo. 1996-177.  A rental activity "means any activity where
payments are principally for the use of tangible property."[12]
Sec. 469(j)(8).

Respondent's argument is straightforward:  Petitioners'
rental activities are passive in nature, and any losses therefrom
cannot be used to offset petitioners' nonpassive income for the
years at issue.  Thus, it is respondent's position that the loss
deductions claimed on petitioners' returns are currently
unavailable and are suspended until a future date when
petitioners have passive gains.  See sec. 469(b).  Petitioners,
on the other hand, assert that they are subject to one of the
exceptions to the presumption in favor of passive classification.

---

[12]It is clear that petitioners' leasing of equipment to
Pauline's Concrete is a rental activity within the purview of
sec. 469.  See Tarakci v. Commissioner, T.C. Memo. 2000-358;
Kelly v. Commissioner, T.C. Memo. 2000-32; Welch v. Commissioner,
T.C. Memo. 1998-310.

The temporary regulations provide six exceptions to the definition of rental activity.[13] See sec. 1.469-1T(e)(3)(ii)(A) through (F), Temporary Income Tax Regs., 53 Fed. Reg. 5702 (Feb. 25, 1988). Those exceptions are: (1) The average use of the property by customers is 7 days or less; (2) the average period of customer use is 30 days or less, and significant personal services are provided by or on behalf of the owner; (3) extraordinary personal services are provided by the owner in connection with making the property available for use by customers; (4) the rental of the property is incidental to a nonrental activity of the taxpayer; (5) the taxpayer customarily makes the property available during defined business hours for nonexclusive use by various customers; or (6) the property is provided by a partner or S corporation shareholder to his partnership or S corporation. Id. Given the stipulated record, we glean from petitioners' brief that their argument is trained upon the third and fourth exceptions listed above.[14]

---

[13]The regulations were prescribed by the Commissioner under the broad regulatory authority delegated to him by Congress through sec. 469(l)(1).

[14]Clearly, since the lease agreement by and between petitioners and Pauline's Concrete is exclusive, for a term of 10 years, and Pauline's Concrete was a C corporation, the other enunciated exceptions cannot apply.

### (a) The Incidental Exception

Although not clearly articulated in their brief, petitioners apparently argue that their rental activity is incidental to their nonrental activities, excepting them from the presumption of passive characterization.  See sec. 1.469-1T(e)(3)(ii)(D), Temporary Income Tax Regs., supra.  As it relates to this case, the regulations "test" provides in pertinent part:

> (c)  Property used in a trade or business.  The rental of property during a taxable year shall be treated as incidental to a trade or business activity * * * if and only if--
>
> > (1) The taxpayer owns an interest in such trade or business activity during the taxable year;
> >
> > (2) The property was predominantly used in such trade or business activity during the taxable year or during at least two or the five taxable years that immediately precede the taxable year; and
> >
> > (3) The gross rental income from such property for the taxable year is less than two percent of the lesser of--
> >
> > > (i) The unadjusted basis of such property; and
> > >
> > > (ii) The fair market value of such property.  [Sec. 1.469-1T(e)(3)(vi)(C), Temporary Income Tax Regs., 53 Fed. Reg. 5703 (Feb. 25, 1988); emphasis added.]

Petitioners presented no evidence that the amount of the rental income earned for the years at issue met the 2-percent test.  Cf. Tarakci v. Commisioner, T.C. Memo. 2000-358.  The record does not establish the fair market value or unadjusted basis of the

property leased by petitioners to Pauline's Concrete. Accordingly, petitioners have not shown they meet the requirements of this exception.

(b) The Extraordinary Personal Services Exception

Petitioners argue in their brief that "the services * * * [they] provide are personal in nature and not merely the rental of concrete pumping trucks and equipment". For purposes of the extraordinary personal services exception, the temporary regulations provide:

> extraordinary personal services are provided in connection with making property available for use by customers only if the services provided in connection with the use of the property are performed by individuals, and the use by customers of the property is incidental to their receipt of such services. For example, the use by patients of a hospital's boarding facilities generally is incidental to their receipt of the personal services provided by the hospital's medical and nursing staff. Similarly, the use by students of a boarding school's dormitories generally is incidental to their receipt of the personal services provided by the school's teaching staff. [Sec. 1.469-1T(e)(3)(v), Temporary Income Tax Regs., 53 Fed. Reg. 5702 (Feb. 25, 1988).]

Section 1.469-1T(e)(3)(viii), Example (3), Temporary Income Tax Regs., 53 Fed. Reg. 5703 (Feb. 25, 1988), illustrates this exception:

> The taxpayer is engaged in an activity of transporting goods for customers. In conducting the activity, the taxpayer provides tractor-trailers to transport goods for customers pursuant to arrangements under which the tractor-trailers are selected by the taxpayer, may be replaced at the sole option of the taxpayer, and are operated and maintained by drivers and mechanics

employed by the taxpayer. The average period of customer use for the tractor-trailers exceeds 30 days. Under these facts, the use of the tractor-trailers by the taxpayer's customers is incidental to their receipt of personal services provided by the taxpayer. Accordingly, the services performed in the activity are extraordinary personal services * * * and, * * * [thus], the activity is not a rental activity.

In this case, petitioners are not engaged in an activity which provides personal services to Pauline's Concrete. Petitioners simply own and lease cement pumping equipment to Pauline's Concrete. The lease is "net of all costs" to petitioners.[15] While petitioners clearly provide personal services in their capacity as employees of Pauline's Concrete and, in their individual capacity, to construction contractors, nonetheless, <u>with respect to leasing equipment to Pauline's Concrete</u>, the record reflects no provision for services incident to such leasing activities. We hold that petitioners did not provide extraordinary personal services within the meaning of section 1.469-1T(e)(3)(v), Temporary Income Tax Regs., 53 Fed. Reg. 5702 (Feb. 25, 1988). Accordingly, the activity is not excepted from the definition of a rental activity.

Our opinion in <u>Hairston v. Commissioner</u>, T.C. Memo. 2000-386, is instructive. In <u>Hairston</u>, the taxpayers owned heavy construction equipment in their own names which they leased to

---

[15]Under the lease, Pauline's Concrete "shall pay all of the costs associated with the acquisition and maintenance of the leased property including the cost(s) of adequate insurance sufficient to exculpate * * * [petitioners] from any and all liability."

their wholly owned subchapter C corporation.  The corporation was in the business of leasing heavy construction equipment to third parties.  According to the lease agreement between the taxpayers and their corporation, the corporation assumed all the responsibility and costs for the equipment.  Similar to this case, the taxpayers claimed ordinary net losses.  The Commissioner determined that the taxpayers' leasing activity was a passive rental activity and denied the claimed deductions.  This Court analyzed the facts in light of the extraordinary personal services exception and held that the evidence did not establish that the taxpayers

> in their individual capacities provided either
> significant or extraordinary personal services in
> connection with making their equipment available for
> use either by * * * [taxpayers'] customer * * * [their
> corporation] or for use by * * * [the corporation's]
> customers. * * * [Hairston v. Commissioner, supra.]

The Court explained that under the lease agreement, the taxpayers were not obligated as owners of the equipment to provide any services to their corporation or the end users.  "Any services that * * * [the taxpayers] might have performed as * * * [corporate] officers or employees were unrelated to * * * [the taxpayers'] obligations as owners of the equipment."  Id.  Thus, the Court concluded that the taxpayers did not qualify for the extraordinary personal services exception.  A similar result is required here.

Moreover, we cannot attribute the services provided by Pauline's Concrete to petitioners' leasing activities. The grouping rules are inapplicable because they only determine whether a taxpayer materially participates in an activity, not whether an activity is excepted from the definition of a rental activity.

> Section 1.469-4, Income Tax Regs.,
>
> sets forth the rules for grouping a taxpayer's trade or business activities and rental activities for purposes of applying the passive activity loss and credit limitation rules of section 469. A taxpayer's activities include those conducted through C corporations that are subject to section 469, S corporations, and partnerships." [Sec. 1.469-4(a), Income Tax Regs.[16]]

The regulations provide: "One or more trade or business activities or rental activities may be treated as a single activity if the activities constitute an appropriate economic unit for the measurement of gain or loss for purposes of section 469." Sec. 1.469-4(c)(1), Income Tax Regs. Whether such activities constitute an appropriate economic unit depends upon all the relevant facts and circumstances. Sec. 1.469-4(c)(2), Income Tax Regs.

Here, however, this attribution rule does not apply. Section 1.469-4(d)(5)(ii), Income Tax Regs., states that: "An

---

[16]Sec. 1.469-4, Income Tax Regs., applies only to tax years ending after May 10, 1992. See sec. 1.469-11(a)(1), Income Tax Regs.

activity that a taxpayer conducts through a C corporation subject to section 469 may be grouped with another activity of the taxpayer, but only for purposes of determining whether the taxpayer materially or significantly participates in the other activity." (Emphasis added.) See sec. 1.469-5, Income Tax Regs. (regulations on what constitutes material participation). Since we find that petitioners are not excepted from the general definition of "rental activity," we never ask the subsidiary question of whether petitioners materially participated in such nonrental activities. See sec. 469(c)(1); Tarakci v. Commissioner, T.C. Memo. 2000-358; Welch v. Commissioner, T.C. Memo. 1998-310 ("If petitioner establishes that the activity was not a rental activity, he then must establish that he materially participated in the activity to avoid the proscription of section 469.").

## 2. Accuracy-Related Penalty

Respondent determined an accuracy-related penalty of $2,765 for 1991 based solely upon petitioners' failure to report rental income.[17] Prior to submission, petitioners conceded that they had unreported rental income of $55,000 in 1991 which should have been included on their Schedule E. Respondent's determination is presumed correct, and the burden lies with petitioners to

---

[17]On brief, respondent states that he does not seek an increase in the amount of the penalty determined.

demonstrate that respondent's penalty determination was in error.[18]  Rule 142(a).

Section 6662(a) imposes a 20-percent penalty on the portion of an underpayment of tax attributable to, inter alia, any substantial understatement of income tax.  There is a "substantial understatement" of tax if "the amount of the understatement for the taxable year exceeds the greater of" (1) 10 percent of the tax required to be shown on the return or (2) $5,000.  Sec. 6662(d)(1)(A).  An "understatement" means the excess of the amount of tax required to be shown on the return for the year over the amount of tax shown on the return.  Sec. 6662(d)(2)(A).

Section 6664(c) provides an exception to the penalty imposed under section 6662(a).  "No penalty shall be imposed under this part with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion." Sec. 6664(c)(1).  "Underpayment" is defined as the amount by which the tax imposed exceeds the excess of the sum of the amount shown by the taxpayer on his return plus the amounts not shown previously assessed over the amount of rebates made.  Sec. 6664(a).  The determination of whether the taxpayer acted with reasonable cause and in good faith is made on a case-by-case

---

[18]See supra note 11.

basis, contemplating all the relevant facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs.

Here, there is a substantial understatement of tax attributable to petitioners' failure to report rental income in 1991. The total understatement and the amount required to be shown on the return was $17,097. The amount of the understatement attributable to the unreported rental income was $13,823.

There is no evidence in the record that respondent was erroneous in the application and computation of the accuracy-related penalty. Petitioners offered no argument or excuse for their failure to report the rental income. Accordingly, we hold that respondent was not erroneous in his determination of a penalty. See Esposito v. Commissioner, T.C. Memo. 2001-131.

Decision will be

entered for respondent.