T.C. Memo. 2004-272

UNITED STATES TAX COURT

ERIC B. BENSON, ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos.   585-98, 19416-98,   Filed November 29, 2004.
              19417-98, 19421-98,
              12967-00, 14171-01.

John M. Youngquist, for petitioners.

Michael E. Melone and Charlotte Mitchell, for respondent.

_____

    [1]Cases of the following petitioners are consolidated
herewith:  Brad D. Benson, docket No. 19416-98; Mark D. Benson,
docket No. 19417-98; Eric B. Benson, docket No. 19421-98; Burton
O. and Elizabeth C. Benson, docket Nos. 12967-00 and 14171-01.

MEMORANDUM FINDINGS OF FACT AND OPINION

RUWE, Judge: These cases were consolidated for purposes of trial, briefing, and opinion. Respondent determined deficiencies in petitioners' Federal income taxes, additions to tax pursuant to section 6651(a)(1),[2] accuracy-related penalties, and additions to tax/fraud penalties pursuant to sections 6653(b) and 6663[3] for the docket numbers, taxable years, and in the following amounts as stated:

Eric B. Benson, Docket No. 585-98:

| Year | Deficiency | [1]Additions to Tax/Penalties Sec. 6651(a) | Sec. 6663(a) |
|------|-----------|----------------------------------|--------------|
| 1993 | $236,997 | $59,793 | $177,748 |

[1]Respondent asserts the accuracy related penalties as an alternative in the event that the Court does not find fraud.

Brad D. Benson, Docket No. 19416-98:

| Year | Deficiency | Penalty Sec. 6662(a) |
|------|-----------|----------------------|
| 1994 | $43,906 | $8,781 |

---

[2]All section references are to the Internal Revenue Code in effect for the taxable years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[3]In the notices of deficiency, respondent took an alternative position that accuracy-related penalties pursuant to sec. 6662(a) for the tax years 1989, 1990, 1993, and 1994 apply to the extent additions to tax/fraud penalties do not. See also infra note 70.

Mark D. Benson, Docket No. 19417-98:

|  |  | Penalty |
| Year | Deficiency | Sec. 6662(a) |
| 1994 | $50,158 | $10,032 |

Eric B. Benson, Docket No. 19421-98:

|  |  | Penalty |
| Year | Deficiency | Sec. 6662(a) |
| 1994 | $36,853 | $7,370 |

Burton O. and Elizabeth C. Benson, Docket No. 12967-00:

|  |  | [1]Additions to Tax/Penalties | | |
| Year | Deficiency | Sec. 6651(a) | Sec. 6653(b) | Sec. 6663(a) |
| 1988 | $125,578 | – | $100,654.50 | -- |
| 1989 | 168,666 | $42,173.50 | -- | $126,499.50 |
| 1990 | [2]113,559 | 28,390.25 | -- | 85,169.25 |
| 1993 | [3]1,500,523 | -- | -- | 1,125,392.25 |

[1]Respondent asserts the accuracy related penalties as an alternative in the event that the Court does not find fraud.

[2]In his second amendment to answer to petition as amended, docket No. 12967-00, respondent asserted an increase in the deficiency amount, addition to tax, and fraud penalty for 1990 of $122,930, $30,733, and $92,197.50, respectively. See infra p. 5, table, note 2.

[3]In his second amendment to answer to petition as amended, docket No. 12967-00, respondent decreased the amount of the deficiency and fraud penalty for 1993 to $1,499,627 and $1,124,720.25, respectively.

Burton O. and Elizabeth C. Benson, Docket No. 14171-01:

|  |  | Penalty |
| Year | Deficiency | Sec. 6663(a) |
| 1994 | [1]$118,429 | $88,821.75 |

[1]In his amendment to answer, docket No. 14171-01, respondent asserted an increase in the deficiency amount and fraud penalty

for 1994 of $129,902 and $97,426.50, respectively.  See infra p. 5, table, note 2.

In the notices of deficiency, respondent asserted many alternatives and whipsaw positions.  For ease of explanation, we address only those issues which we decide.  Additionally, there are numerous computational issues which we omit from our discussion.  Because of the interconnected nature of these cases, our findings and holdings as to some petitioners will have ramifications to other petitioners.  As a result, there will be extensive adjustments made by the parties under a Rule 155 computation.

After numerous concessions by respondent and petitioners,[4] the issues remaining for decision are as follows:

1.  Whether petitioners Burton O. and Elizabeth C. Benson (the Bensons) received and failed to report constructive dividends.  The transactions still at issue for the years and the amounts are listed as follows:

---

[4]Because of their number, a summary of the parties' concessions is attached hereto and incorporated herein as an appendix.

| Description | Tax Year 1988 | 1989 | 1990 | 1993 | 1994 |
|---|---|---|---|---|---|
| ERG-Recreation acct. | -- | -- | -- | $8,000 | $2,698 |
| Transfers ERG to NPI | $180,000 | $483,098 | -- | 3,600,000 | 160,063 |
| 143 Alice Lane | -- | -- | $336,500 | -- | -- |
| Prop. taxes Alice Ln. | -- | -- | -- | 3,879 | 8,196 |
| Check ref: Carroll | -- | 96,749 | -- | -- | -- |
| Automobile deductions | 9,465 | 10,624 | 8,676 | 14,808 | 14,723 |
| Charitable deduction | -- | -- | -- | 50,000 | -- |
| Excess rent--Stanford[1] | -- | -- | [2]40,067 | 46,560 | 63,444 |
| Rent--Lowell plant | 31,850 | 29,400 | 29,400 | 31,020 | [3]41,376 |
| Director's fees | | | | | |
|   Elizabeth Benson | -- | 3,000 | 12,000 | 12,000 | 12,000 |
|   Related parties | -- | 3,000 | 11,000 | 30,000 | 25,000 |
|   Esther Benson check | -- | -- | -- | -- | 12,000 |
| Townsend check | -- | -- | -- | -- | 15,000 |
| Travel expenses | -- | -- | -- | -- | 6,690 |
| Legal expenses | -- | -- | -- | -- | 4,159 |
| Employee relations | -- | -- | -- | -- | 4,027 |
|   Total | 221,315 | 625,871 | 437,643 | 3,796,267 | 369,376 |

[1]The record and briefs contain inconsistencies with respect to respondent's determinations for the Stanford and Lowell plants. Indeed, generally, the notices of deficiency list the amounts stated above for Stanford as that for Lowell, and vice versa. For example, on one page of the Bensons' notice of deficiency for 1994, the adjustment for "Excess rents for Stanford plant" is listed as $41,736 and for "ERG's payments for Lowell plant" as $35,316. On the very next page, the excess rent for Stanford is listed as $35,316 and for Lowell as $41,736. Respondent's answers, amendments thereto, and brief mimic the amounts stated above. We assume a clerical error and assign no substantive significance to this error.

[2]On brief, respondent explained that he amended his answers in docket Nos. 12967-00 and 14171-01, which amendments caused respondent to assert increased deficiencies for the Bensons, for tax years 1990 and 1994. See supra p. 3, tables, notes 1 & 2. However, for 1993 his amendment caused a decrease in the amount determined; respondent determined in the notice of deficiency that the Bensons failed to report $48,758 in rent for the Stanford plant. See supra p. 3, table, note 3.

[3]Clearly, there is a clerical error in the amount stated in respondent's brief, $41,376, as the amount listed in the notice of deficiency is $41,736.

2. whether the Bensons received and failed to report other income. The transactions still at issue for the years and in the amounts are as follows:

| Description | Tax Year 1988 | 1989 | 1990 | 1993 | 1994 |
|---|---|---|---|---|---|
| Dividend income | -- | -- | -- | -- | $1,072 |
| Discharge debt | -- | -- | -- | -- | [1]88,291 |

[1]Respondent alternatively argues that this amount is includable in 1988.

3.  whether the Bensons are entitled to deduct expenses with respect to a ski cabin owned by the Baden Spiel Haus partnership in the amount of $2,635 for 1994;

4.  whether the Bensons are entitled to claim a deduction for residential rental expenses in excess of the amounts allowed by respondent;

5.  whether Burton Benson is liable for fraud penalties for the years at issue;[5] or

    (a) alternatively, whether the Bensons are liable for accuracy-related penalties for the years 1989, 1990, 1993, and 1994;

6.  whether Eric B. (Eric), Brad D. (Brad), and Mark D. (Mark) Benson are liable for accuracy-related penalties as determined;

7.  whether the Bensons and/or Eric are liable for additions to tax for failure to file a Federal income tax return pursuant to section 6651(a)(1) as determined;

8.  whether the period of limitations bars assessment of the Bensons' taxes reported on their 1988, 1989, 1990, 1993, and 1994 Federal tax returns;

---

[5]We use the term "fraud penalties" to include the addition to tax for 1988 under sec. 6653(b).

9. whether Eric, Brad, and Mark received and failed to report distributions from an S corporation in excess of their stock basis;

10. whether Eric, Brad, and Mark are subject to the passive loss rules with respect to passthrough rental losses from an S corporation.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, the supplemental stipulations of facts, the stipulations of settled issues, and the attached exhibits are incorporated herein by this reference. At the time of filing the petitions, each petitioner's legal residence was Orinda, California.

1. Background

Burton O. Benson (Burton) served 9 years as an officer in the U.S. Navy and 23 years as an officer in the U.S. Naval Reserve, retiring with the rank of Rear Admiral. Burton earned a B.S. degree in mechanical engineering from the University of Minnesota. Eric, Mark, and Brad are the sons of the Bensons.[6] Glendon M. Benson (Glendon) is the elder brother of Burton. Esther V. Benson (Esther) was the mother of Burton and Glendon.

---

[6]Eric, Mark, and Brad were born on July 24, 1974, Aug. 26, 1976, and Aug. 11, 1981, respectively.

Energy Research & Generation, Inc. (ERG) is a corporation incorporated by Glendon, his wife, Janet Benson, and Burton in California on January 5, 1967. During the years at issue, ERG utilized the accrual method of accounting for tax purposes.

ERG is the only company in the world that manufactures various forms of foam metal and foam metal baffles.[7] Duane Walz and Glendon invented the process known as foam metal which Glendon then developed into a product. However, Walz was given sole credit as the inventor in the patent, and on March 23, 1976, he assigned his patent rights to ERG.

On each of the tax returns filed by ERG for 1988 through 1994, Burton is listed on Schedule E, Compensation of Officers, as owning 100 percent of the common stock of ERG. Throughout the years 1988 through 1994, Burton was a director of ERG. Throughout the years 1988 through 1994, ERG maintained a money market account with Merrill Lynch Pierce, Fenner & Smith, Inc., account No. 280-07888-2 (ERG's bank account).

New Process Industries, Inc. (NPI) was originally incorporated in Minnesota in 1922 by Burton and Glendon's father under the name New Process Laundries, Inc. On January 6, 1967, the name was changed to NPI. During the years at issue, NPI

---

[7]Foam metal baffles are used in the U.S. Navy's fleet of ballistic missiles.

utilized the cash method of accounting for tax purposes and was an S corporation.

The Benson family's percentage of ownership in NPI was listed on its tax returns for the individuals, for the years, and in the amounts as stated:

| | Year of NPI Return | | | | | | |
|---|---|---|---|---|---|---|---|
| Individuals | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 |
| Burton | 66.7 | 66.7 | 66.7 | 66.7 | 50.0 | 66.7 | 50.0 |
| Esther | 33.3 | 33.3 | 33.3 | 33.3 | 50.0 | -- | -- |
| Eric | -- | -- | -- | -- | -- | 11.1 | 16.7 |
| Brad | -- | -- | -- | -- | -- | 11.1 | 16.7 |
| Mark | -- | -- | -- | -- | -- | 11.1 | 16.7 |

Throughout the years at issue, there was no written agreement between ERG and NPI relating to engineering, design, or management services, NPI did not treat anyone as an employee, and no Form 941, Federal Payroll Tax Returns, was filed or Form 1099 was issued. During this same period, NPI maintained a money market account with Merrill Lynch Pierce, Fenner & Smith, Inc., account No. 280-07017-8 (NPI's bank account).

During the years at issue, NPI owned three parcels of real property located in Oakland, California: (1) 952 57th Street (Lowell plant); (2) 900-960-962-964 Stanford Avenue (Stanford plant); and (3) vacant land adjacent to 900 Stanford Avenue fronting on Lowell Street. Before and after July 1, 1987, ERG conducted its foam metal manufacturing operations from the Stanford Plant.

In the mid-1980s, a dispute arose between Burton and Glendon over the operation and ownership of ERG. On April 4, 1985, the Bensons filed a lawsuit against Glendon, his wife Janet, and ERG. In or about September 1985, Glendon convened an ERG board meeting during which the directors in attendance supposedly voted to terminate Burton's employment with ERG. Immediately thereafter, Glendon hired security personnel to bar Burton from entering ERG's facilities.

In October 1985, Burton and Glendon executed an agreement delineating their respective responsibilities concerning contracts with two major ERG clients, Hercules Aerospace Co., Inc. (Hercules),[8] and Gas Research Institute (GRI). Essentially under that agreement, Burton was granted all rights to and responsibility for contracts with Hercules, and Glendon was granted all rights to and responsibility for contracts with GRI.

In May 1986, Burton and Glendon initiated binding arbitration. On July 9, 1986, the arbitration panel issued an interim decision. In October 1986, Burton and Glendon entered into an agreement to adjourn the arbitration proceedings choosing instead to mediate the dispute with the aid of Winston E. Miller (Miller or WEM) as mediator. On June 28, 1987, during the course of mediation, Burton and Glendon entered into an agreement

---

[8]Hercules and all predecessors and successors in interest will be referred to throughout this opinion as Hercules.

entitled "Memorandum Re: Unbundling of ERG". Burton and Glendon executed a document entitled "Supplemental Memorandum Re: Unbundling of ERG (December 4, 1987)". On December 5, 1987, Burton and Glendon executed a document entitled "Memorandum Re: Other Commitments made to WEM".[9]

By letter dated March 18, 1988, ERG and NPI, through Burton, gave instructions to their patent counsel of the firm Townsend & Townsend to transfer certain patents, patent applications, and intellectual property to Glendon. The parties stipulated that on December 29, 1988, Glendon incorporated Aker Industries, Inc. (Aker).[10] After July 1987, and during all periods relevant to these cases, Burton exercised almost sole control over the management and operations of ERG and NPI.

On March 23, 1993, Glendon and his wife, Janet, filed a motion asking a California court to enforce the unbundling agreement as a settlement agreement. In response to a 1994 petition filed by Burton, the court ordered the parties to recommence arbitration. In 1994, arbitration proceedings recommenced. On June 7, 1995, a second interim arbitration

[9]Except as otherwise noted to the contrary, we refer to the documents executed by Burton and Glendon during mediation collectively as the "unbundling agreement".

[10]On Feb. 29, 1988, Burton signed a City of Oakland Business Tax Declaration stating that ERG's research and development division had been established as a new company, "Acker [sic] Industries". However, Glendon testified that Aker was incorporated in July 1987.

decision was issued. On November 8, 1996, a third interim arbitration decision was issued.

On March 5, 1999, a final arbitration decision was issued. The final arbitration decision comprehensively decided the issues between the brothers, and the arbitrators found, inter alia, that:

> During the period from and after July 1, 1987, * * * [Burton]/ERG/NPI was extremely successful * * *. As a result, in the period from 1988 through 1996, * * * [Burton] and his family obtained in excess of $6,500,000 in salaries, director's fees and cash distributions from ERG/NPI.
>
> * * * [F]rom and after July 1, 1987, * * * [Burton] had total control over both ERG and NPI * * *

Accordingly, the arbitrators held that Burton became the 100-percent owner of ERG on July 1, 1987. The arbitrators found that Burton owed Glendon a gross amount of $3,119,475 for his interest in ERG. The arbitrators awarded the Lowell plant to Glendon/Aker, for which Burton received a credit of $185,500. The tribunal found that Glendon/Aker should have paid NPI rent for the Lowell plant at $2,000 per month for the period July 1, 1987, to December 31, 1994, and $2,500 thereafter. Accordingly, Burton was credited with the rent payments plus interest, $420,650. The final arbitration decision awarded Glendon a net $2,412,172 after credits and deductions.

## 2. Constructive Dividend Issues

### (a) The ERG-Recreation Fund Account

On or about April 5, 1985, Burton submitted an application to open an account with the Franklin Group of Funds (Franklin) under the name "ERG-Recreation Fund". The account was opened and assigned money fund account No. 1110267091-7 (the ERG-Recreation fund account). During the years 1988 through 1994, Burton was the only person with signature authority over the ERG-Recreation fund account. Checks written against the account were payable through Bank of America.

In 1988, numerous checks were deposited into the ERG-Recreation fund account aggregating $4,387.34. Additionally, checks were written from this account. For example, check No. 6, dated September 7, 1988, payable to NPI for the amount of $3,000 was signed by Burton. This check was deposited into NPI's bank account during the period August 27 to September 30, 1988.

In 1990, numerous checks were deposited into the ERG-Recreation fund account aggregating $11,097.53. In 1990, three checks were written on this account, all signed by Burton, for example: (1) Check No. 7, dated April 5, 1990, for $3,128 was written to Michael's Reno Suzuki; and (2) check No. 8, dated June 16, 1990, for $597.44 made payable to Anytime Power Sports Equipment.

In 1993, numerous checks were deposited into the ERG-Recreation fund account aggregating $8,819.73. In 1993, five checks were drawn on this account, all signed by Burton, for example: (1) Check No. 27, dated March 8, 1993, for $9,000 made payable to ERG; (2) check No. 29, dated June 11, 1993, for $356 made payable to Siegle's;[11] (3) check No. 30, dated July 15, 1993, for $9,000 made payable to petitioner Mark;[12] and (4) check No. 31, dated August 16, 1993, for $8,000 made payable to ERG Retirement Trust.

The parties stipulated that in 1994, numerous checks were deposited into the ERG-Recreation fund account aggregating $6,068.[13] In 1994, eight checks were drawn on this account, all signed by Burton, for example: (1) Check No. 32, dated May 13, 1994, for $100 made payable to Mt. Diablo Silverado Council, BSA; (2) check No. 34, dated August 13, 1994, for $206.38 made payable to Berkeley Yamaha; (3) check No. 35, dated September 15, 1994,

[11]In 1993, Siegle's Guns was a firearms retailer in Oakland, Ca.

[12]On July 19, 1993, check No. 30 was deposited into a custodial account into which Burton deposited his payroll checks and other checks from ERG.

[13]The parties stipulated that in 1994 "numerous checks from various sources were deposited into the ERG Recreation Fund Account in the aggregate amount of $6,068" and referenced an exhibit in the record. The referenced exhibit contains copies of an annual account statement for this account which shows aggregate deposits of $5,864.42 for 1994. Additionally, the referenced exhibit contains copies of checks apparently deposited into this account in the aggregate amount of $4,411.85.

for $274.66 made payable to Bobbi Judson; (4) check No. 37, dated September 24, 1994, for $265 made payable to Marc Dronkers; (5) check No. 38, dated November 23, 1994, for $650 made payable to Donald J. Holleran; and (6) check No. 39, dated December 14, 1994, for $724.10 made payable to Marc Dronkers.  Check Nos. 35 and 39 note Risktaker in the memo section of the checks, which refers to a sailboat partly owned by Burton.

(b) Payments From ERG to NPI

During the years 1988 through 1994, Burton caused ERG to transfer significant funds to NPI on the dates and in the amounts as follows:

| Date Transferred | Amount | Date Deposited |
|---|---|---|
| 12/30/88 | $180,000 | Unknown |
| 4/15/93 | 750,000 | 4/21/93 |
| 4/15/93 | 190,000 | 4/21/93 |
| 4/20/93 | 2,060,000 | 4/26/93 |
| 12/30/93 | 600,000 | 1/10/94 |
| 4/15/94 | 129,414 | 4/19/94 |
| 6/17/94 | 30,649 | 6/22/94 |
| Total | 3,940,063 | |

Burton never told his accountant and return preparer, Edward Bradac (Bradac), about ERG's 1988 transfer of $180,000 to NPI. Bradac was unaware of the transfer until late 1995 or early 1996 when he worked on compiled financial statements for ERG.

All the aforementioned transfers were made from ERG's bank account and deposited into NPI's bank account.

(c) <u>Payment for Increased Baffle Production</u>

One of ERG's principal customers was Hercules. During the years at issue, ERG produced a baffle system on behalf of Hercules with respect to the Trident II D-5 U.S. Navy Fleet Ballistic Missile Program.[14] At some point, Hercules requested an increase in the production of baffle sets. ERG, through Burton, indicated that to increase production ERG would require additional equipment and materials.

On or about November 22, 1989, Hercules and ERG entered into a memorandum of agreement (MOA), whereby Hercules agreed to pay $483,098 as an add-on cost to increase production of the baffle sets delivered by ERG.[15] The MOA was unique because it called for Hercules to "facilitize" or fund ERG's plant and equipment, the cost of which is normally paid for by the owner of the plant and equipment. Attached to the MOA is "schedule 1", which lists the equipment and their associated prices as contemplated by the

---

[14]The baffles were made from ERG's foam metal.

[15]Under the MOA, the add-on cost was spread over the invoicing of the baffle sets delivered. The MOA states in pertinent part:

> The add-on cost per Baffle per year will be the sum of the seven year double declining schedule amount for that particular year plus the Cost Accounting Standards cost of money, * * * evenly divided among the number of Baffles that are scheduled to be delivered within that year. * * *

MOA.[16]   Some of the items listed involve proprietary processes. The projected prices in schedule 1 include the cost of time and engineering to specify the details of the equipment, to design the assembly, modifications, and installations of the equipment, and to do debugging on the production process to make sure the equipment worked properly.  Some of the equipment was supposedly to be created by ERG.[17]

On or about December 20, 1989, ERG and NPI entered into a "Plant Equipment & Facilities Purchase Agreement".  Under this agreement, in exchange for $483,098, NPI agreed to purchase, deliver, install, and place into operation as a "turnkey operation" the items listed on schedule 1 of the MOA, which was incorporated into the agreement.  On or about December 29, 1989, ERG issued check No. 20498 to NPI for $483,098.

On August 8, 1990, Burton, as president of ERG, executed a document entitled "Certification That Plant Equipment/Facilitization Items Are in Place and Operational". By this document, Burton certified to Hercules that the equipment listed on schedule 1 of the MOA was in place and operational at ERG, or would be by December 31, 1990.

---

[16]ERG's chief engineer, Bryan Leyda, testified that he created the prices on schedule 1 with the help of an associate engineer.

[17]Mr. Leyda testified:  "There's no way that you can buy this kind of * * * [equipment] off the shelf.  You might buy pieces, but not the entire piece of equipment."

Hercules paid ERG the $483,098 agreed to in the MOA in increments included in the amounts it paid to ERG for each baffle set purchase order during the period 1990 through 1997. However, neither NPI nor ERG purchased the equipment listed on schedule 1 of the MOA.

On its original 1989 Form 1120S, U.S. Income Tax Return for an S Corporation, NPI did not report any portion of the $483,098 payment from ERG. On its 1989 Form 1120, U.S. Corporation Income Tax Return, ERG deducted $248,097 of the $483,098 payment to NPI as a royalty. On its amended 1989 Form 1120S, NPI reported income of $248,097 with respect to the $483,098 payment from ERG. On its original 1990 Form 1120S, NPI reflected the $483,098 payment from ERG as an increase in liabilities; i.e., a security deposit. On its 1990 Form 1120, ERG deducted $193,508 of the $483,098 payment to NPI as a royalty.

(d) Exclusive Royalty Agreement Between ERG and NPI

ERG owned and/or was assigned certain patent technologies. Additionally, Glendon assigned to NPI numerous patents which were issued for technologies he invented. On or about March 10, 1990, Burton executed as president of both NPI and ERG, a document entitled "Agreement of Sale and Exclusive License" (exclusive license agreement).[18] The document had a retroactive effective

---

[18]The agreement also bears the signatures of Elizabeth and Esther.

date of July 1, 1987, and a 40-year term.[19]  The document
purports to sell certain "patent rights" owned by ERG to NPI and
simultaneously grants ERG an exclusive license to use the patent
rights transferred.  The patent rights are described as the
"technology, technique, show-how, and know-how" relating to foam
metal, RVC foam, and SIC foam.

Pursuant to the agreement, NPI purchased ERG's patent rights
for $5,000 and 50 percent of all consideration that NPI received
from the "assignment, licensing, sublicensing, leasing, or other
commercial exploiting" of the patent rights.  Under the
agreement, ERG would pay to NPI, inter alia, 10 percent of its
net sales of any product incorporating the patent rights licensed
to ERG by NPI.

(e) <u>143 Alice Lane</u>

During the years at issue, the Bensons owned, and used as
their principal residence, real property located at 5 Evans
Place, Orinda, California.  The Bensons entered into an agreement
with Dover Construction, dated June 13, 1990, to purchase a
portion of real property adjacent to their residence (the Dover

---

[19]During arbitration proceedings, Miller gave testimony
concerning this agreement.  On Apr. 7 and 8, 1997, Miller
testified that it was his advice to Burton to create the
agreement.  In fact, Miller testified that he gave Burton a
"model" license agreement from which to fashion the agreement
between ERG and NPI.  Furthermore, Miller testified that there
was nothing unusual about backdating the agreement.

property).[20]  Abutting the Dover property is the real property located at 143 Alice Lane, Orinda, California (143 Alice Lane).

In June 1990, ERG purchased 143 Alice Lane for $335,000.[21] ERG took title to the property in the name "Burton O. Benson, Trustee" of the ERG Retirement Trust.[22]  The ERG Retirement Trust neither paid for the purchase nor reflected the property as an asset on any tax return or financial statement.  ERG's purchase of 143 Alice Lane, along with the Bensons' purchase of the Dover property, gave the Bensons a large, uninterrupted piece of land behind and abutting their residence.

On or about April 10 and December 10, 1993, ERG paid $1,925.57 and $1,953.14, respectively, for property taxes on 143 Alice Lane.  In 1994, ERG paid $8,196 in property taxes for 143 Alice Lane.

On October 28, 1997, Burton as trustee of the ERG Retirement Trust deeded 143 Alice Lane to the Bensons as husband and wife.

---

[20]The Bensons were deeded the Dover property on or about May 23, 1991.

[21]The price paid inclusive of fees and taxes was $336,410.72.

[22]During the years at issue, ERG maintained a single plan qualified under ch. 1, subch. D of the Code, the Energy Research & Generation, Inc., Profit Sharing Plan (the plan).  The plan assets were invested in a single trust, the ERG Retirement Trust. ERG maintained Franklin Money Fund accounts under the names ERG Ford Retirement Trust and ERG Retirement Trust.  The ERG Dynar Retirement Trust and the ERG Ford Retirement Trust are not separate trusts.

The deed shows no consideration for the transfer and indicates the transfer was a "gift to spouse".

(f) ERG Check to Burton (Ref. Carroll)

On May 17, 1989, a petition for confirmation of arbitration award and entry of judgment was filed in the California Superior Court, San Francisco County. According to that document, Michael Brooks Carroll (Carroll) provided advice and legal services with respect to the disagreement Burton had with his brother concerning the ownership, management, and control of NPI and ERG. Burton withheld payment for such services. The arbitrators rendered a decision that Burton owed Mr. Carroll $96,748.98, plus interest thereon.

On May 19, 1989, ERG issued Burton check No. 19888 for $96,748.98. The check bears the notation "for Michael B. Carroll." The check was endorsed "For Deposit Only Wells Fargo Bank 740-6070466," an equity credit line of the Bensons (the Bensons' Wells Fargo bank account). The check was deposited and accepted for payment on May 24, 1989.[23] On or about May 23, 1989, Burton purchased a Wells Fargo Bank cashier's check No. 13499 made payable to Carroll for $97,467.21 from the Bensons'

---

[23]The check was initially presented for payment on May 19, 1989, but not honored because of insufficient funds. On May 24, 1989, the check was again presented for payment.

Wells Fargo bank account.[24]  On their 1989 Form 1040, U.S. Individual Income Tax Return, the Bensons claimed a deduction for a portion of the legal fees paid to Mr. Carroll of $77,973.

(g) Automobile and Truck Deductions

ERG claimed deductions for automobile and truck expenses for the following years in the amounts stated:

| Tax Year | Amount of Deduction |
|----------|---------------------|
| 1988 | $9,645 |
| 1989 | 10,624 |
| 1990 | 23,676 |
| 1993 | 28,308 |
| 1994 | 14,723 |

ERG bought a Jeep for Eric for $15,000 in 1990 and a Ford Bronco for Mark for $13,500 in 1993.  ERG's claimed deductions included the cost of purchasing these two vehicles, as well as DMV fees, insurance, gasoline, and repairs for four family cars.  The Bensons conceded that the purchase of the automobiles constituted constructive dividends.  See appendix.

The Bensons were authorized signators on a First Interstate checking account No. 804-2-01477, which was used exclusively to pay for gasoline purchases through Interlink bank debit card(s) linked to that account.  During the years listed, ERG paid the following amounts for gasoline:

---

[24]The record does not disclose why there is a difference between the amount of the arbitration award and the amount of the payment.  We assume since the arbitrators' award included "interest thereon" that the additional money is accrued interest from the date of the decision to the date of payment.

| Tax Year | Amount |
|----------|--------|
| 1990 | $1,853.00 |
| 1993 | 4,194.09 |
| 1994 | 4,383.16 |

(h) Charitable Contributions

In 1989, ERG donated $6,000 to the Moraga Valley Presbyterian Church (MVPC). On its 1989 Form 1120, ERG claimed the $6,000 as a charitable deduction. On their 1989 Form 1040, the Bensons also claimed a $6,000 charitable deduction for MVPC.

In 1990, ERG donated $6,000 to MVPC. ERG did not claim the donation as a deduction on its 1990 Form 1120; however, the Bensons did claim the donation as a deduction on their 1990 individual Federal income tax return.

In 1993, ERG issued checks payable to MVPC totaling $6,000. ERG issued check No. 23554, dated December 31, 1992, for $50,000 made payable to Bank of America. The check was negotiated on March 3, 1993. On March 5, 1993, Burton purchased cashier's check No. 8006822409 for $50,000 from Bank of America made payable to MVPC. MVPC deposited the check on March 12, 1993. ERG's 1993 Form 1120 contained a deduction for charitable contributions of $4,800 and no charitable contribution carryover. On their 1993 personal Federal income tax return, the Bensons claimed a charitable contribution deduction for the $6,000 paid to MVPC by ERG and the $50,000 cashier's check paid to MVPC.

In 1994, ERG paid $13,500 to MVPC and $2,000 to Camp Timberwolf. On their personal return, the Bensons claimed a charitable contribution deduction of $33,374, which included $2,000 to Camp Timberwolf and $18,000 to MVPC. ERG's 1995 Form 1120 reflected charitable contribution carryovers of $102,646 from 1991, $13,200 from 1992, $1,984 from 1993, and $20,000 from 1994. The $20,000 shown as a carryover from 1994 included a $10,000 contribution to MVPC and a $2,000 contribution to Boy Scouts of America (Timberwolf).

(i) Rent Paid to NPI for Stanford and Lowell Plants

Throughout 1988-94, ERG occupied the Stanford plant which was owned by NPI. In 1988, a commercial lease for the Stanford plant was prepared but not executed. Similarly, in 1988, a commercial lease for the Lowell plant was prepared but not executed. The Lowell plant was used by Glendon/Aker.[25] During the period 1988-94, ERG paid monthly rent to NPI for both the Stanford and Lowell plants.[26] The parties stipulated that the

---

[25]Glendon testified that he did not pay rent to NPI during the period July 1987 through December 1994.

[26]Burton testified that before the arbitrators' final decision in March 1999, he considered it ERG's responsibility to pay the rent for ERG's research and development division, Aker Industries. In the final arbitration decision, the arbitrators decided that Glendon/Aker was liable to NPI for rent for the period July 1, 1987, through Dec. 31, 1998, in an amount including interest, totaling $420,650.

rent was paid and allocated between the properties for the years as follows:

| Year | ERG Payments to NPI | Stanford | Lowell |
|------|---------------------|----------|--------|
| 1988 | $98,917 | $67,067 | $31,850 |
| 1989 | 83,699 | 56,749 | 26,950 |
| 1990 | 137,917 | 106,067 | 31,850 |
| 1993 | 146,400 | 112,560 | 33,840 |
| 1994 | [1]168,360 | 129,444 | 38,296 |

[1]The amounts stated above are those listed in a joint exhibit offered by the parties. However, it is clear that $129,444 plus $38,296 does not equal $168,360, but instead $167,740.

(j) Director's Fees[27]

As detailed below, ERG paid purported "director's fees" during the years at issue.[28] ERG did not file Forms 1099 with respect to payment of any of the director's fees.

(i) Elizabeth C. Benson

In 1989, ERG issued three $1,000 checks payable to Elizabeth, which she deposited into the Bensons' Wells Fargo bank account. In 1990, ERG issued twelve $1,000 checks payable to Elizabeth, of which she deposited seven into the Bensons' Wells Fargo bank account and five into Franklin account No. 11100025476 (Franklin account). In 1993, ERG issued twelve $1,000 checks

[27]Petitioners concede that amounts that ERG paid should have been included in the returns of the purported directors.

[28]Our categorization is based solely upon the stipulations and characterizations made by the parties. With the exception of two checks issued to Eric, the ERG checks issued do not indicate their intended purpose.

payable to Elizabeth, which she deposited into various bank accounts.[29]  In 1994, ERG issued twelve $1,000 checks payable to Elizabeth, which she deposited into the Franklin account.

(ii) Esther V. Benson

In 1989, ERG issued three $1,000 checks payable to Esther. Each check was deposited in 1990 into a Merrill Lynch Ready Asset account No. 280-72453 (ML RAT account).  In 1990, ERG issued eleven $1,000 checks payable to Esther.  Those checks were deposited into various bank accounts.[30]  In 1993, ERG issued (at least[31]) eleven $1,000 checks payable to Esther.  One check, check no. 23662, was endorsed and deposited into a bank account held in the names Burton and Elizabeth.[32]  In 1993, eleven $1,000 checks were deposited into a bank account which Esther held with Burton as joint tenants with the right of survivorship.[33]  In

---

[29]See infra note 32.

[30]Seven checks were deposited into the ML RAT account and four checks were deposited into a First Bank account No. 711-2005165.

[31]See infra note 33.

[32]On brief, petitioners explained that there was a "mix-up" in the delivery of the director's fees checks in 1993.  Check No. 23661 payable to Elizabeth was deposited into Esther's account, and the director's fee check for Esther was deposited into Elizabeth's account.

[33]There is an inconsistency in the parties' stipulation. The parties stipulated that Esther was issued eleven $1,000 checks in 1993, one of which was deposited into an account owned by Elizabeth and Burton.  The parties also stipulated that eleven
(continued...)

1994 ERG issued eight $1,000 checks payable to Esther.[34]  Esther did not file Federal income tax returns for 1988 through and including 1993.

### Check to Esther V. Benson

In 1994, Burton took an uncashed check for $12,000 that ERG had issued to Esther prior to May 1988, altered the date on the check to indicate a date in August 1994, and deposited the check into a bank account in September 1994 shortly after his mother's death.[35]  The bank account into which the check was deposited was held in the names of Burton and his mother as joint tenants.

---

[33](...continued)
$1,000 checks were deposited into an account owned by Esther and Burton.  Indeed, the documentary evidence in the record contains a bank statement for the Esther/Burton account which shows eleven $1,000 deposits made in 1993.  Additionally, the record contains copies of eleven $1,000 checks, one of which was apparently, erroneously deposited into an account owned by Elizabeth and Burton.  Arguably, then, there must have been twelve $1,000 checks issued to Esther, eleven of which were deposited into the Esther/Burton account and one of which was deposited into the Elizabeth/Burton account.

[34]The parties stipulated that ERG issued eight $1,000 checks to Esther, but the issuing bank was unable to locate a copy of one check.  However, the parties also stipulated that ERG did not file Form 1099 with respect to the $9,000 paid to Esther.  We are unable to resolve the seeming inconsistency and ascribe a scrivener's error to the latter stipulation.

[35]Burton testified that the check represented director's fees, and after his mother died he found the check uncashed among her papers.  He changed the date on the check because he believed it would be rejected due to its age if negotiated.

(iii) <u>Eric B. Benson</u>

ERG issued check No. 23548 for $6,000 to Eric, dated December 30, 1992, on which "Directors Fee - 6 months" is written on the memo line.[36]  On or about February 26, 1993, Burton and Eric submitted an application to open an account with USAA Investment Management Co. as joint tenants (the USAA account). The initial investment into the USAA account was the aforementioned $6,000 check.  In 1993, ERG issued twelve $1,000 checks to Eric, of which eleven were deposited into the USAA account in 1993 and one in 1994.

(k) <u>Townsend & Townsend Check</u>

Townsend & Townsend, patent attorneys, issued a retainer fee refund check for $15,000 dated January 14, 1994, payable to ERG. Burton endorsed the check on behalf of ERG to the order of Massachusetts Mutual Life Insurance Co.  The $15,000 was credited on January 27, 1994, as a partial repayment of loans from the insurance company to Burton relating to insurance policy No. 4506416.[37]  The parties stipulated that during the years at issue the primary beneficiary of the insurance policy was Elizabeth.

---

[36]Eric turned 19 years old on July 24, 1993.  See <u>supra</u> note 6.

[37]Burton testified that loans totaling $15,000 were taken out in 1975 and 1984 against the insurance policy and that the funds were "borrowed from the * * * policy to be put into ERG to meet the payroll."  He testified that none of the loan proceeds were used for his personal benefit.

(1) <u>Travel Expenses</u>

On or about February 9, 1994, Burton signed an ERG travel expense report indicating that he spent $616.47 on behalf of ERG. Additionally, the following charges were made on the dates indicated to an ERG BankAmericard credit card, account No. 0109-733-620:

| Date | Description of Charge | Amount |
|------|----------------------|--------|
| 2/5/94 | Grand Manor Inn #35 Corvallis, OR | $223.82 |
| 5/10/94 | Hertz Rent-A-Car St. Paul, MN | 91.61 |
| 5/10/94 | Radisson Hotels Minneapolis, MN | 227.32 |
| 5/13/94 | Ramada Inns Falls Church, VA | 342.17 |
| 5/13/94 | Hertz Rent-A-Car Washington, D.C. | 137.46 |
| 9/7/94 | Karim Cyclery Berkeley, CA | 16.24 |
| 9/7/94 | Surf Berkeley Berkeley, CA | 56.40 |
| 9/10/94 | Lowell Inn Lake Elmo, MN | 1,542.79 |
| 9/11/94 | SuperAmerica 4454 Bloomington, MN | 9.23 |
| 9/11/94 | Hertz Rent-A-Car St. Paul, MN | 89.90 |
| 12/18/94 | The Claremont Resort | 2,504.30 |
| Total | | 5,241.24 |

ERG paid all these expenses.

Esther passed away sometime in early September 1994, and funeral services were held in Still Water, Minnesota. On or about October 4, 1994, ERG paid $833.06 for travel expenses incurred on behalf of Pastor Leroy M. Nelson, Burton and

Glendon's cousin.  Pastor Nelson presided over Esther's funeral services.

### (m) Legal Expenses

The stipulated documentary evidence shows that in 1994 ERG paid legal expenses of $4,660.19.  The invoices detail the services provided as, inter alia, "Review: information from Burt Benson respecting property line dispute", an appeal to the unemployment office, "Burton O. Benson v. Westinghouse Electric," review of proposed loan agreement, probate questions re: mother's estate, etc.

### (n) Employee Relations Expenses

ERG purchased Oakland baseball tickets for $2,119.50, the invoice for which was paid on or about February 11, 1994. Additionally, respondent submitted copies of monthly invoices for the Lakeview Club for the period December 25, 1993, through September 25, 1994.  These invoices are addressed to "RADM Burton O. Benson" and bear his home address.  The total amount shown as being paid on these invoices is $915.66.

## 3. Nonconstructive Dividend Issues

### (a) Dividend Franklin Accounts

On or about May 1, 1983, Burton submitted an application to open a joint investment account with the Franklin Money Fund (Franklin).  The application bears the name "Benson Properties Unlimited" as owner, Eric or Burton as co-owner, and Eric's

Social Security number.  Franklin opened the account and assigned it account No. 11102309431 (Franklin account #1).  On or about December 28, 1983, Burton and Elizabeth submitted an account revision form to Franklin, changing the signatories to "Burton O Benson/Elizabeth C. Benson and no others."

Throughout 1988, 1989, 1990, 1993, and 1994, rent payments received from tenants occupying residential real properties owned by the Bensons were deposited into the Franklin account #1.  Expenses incurred with respect to those properties were also paid from this account.  During the years 1988, 1989, 1990, 1993, and 1994, dividends were credited to this account in the amounts of $204, $193, $229, $360, and $1,072.03, respectively.[38]  For the years at issue, the Bensons did not report interest or dividend income from Franklin account #1.  However, on his 1994 return Eric reported dividend income from Franklin account #1 of $1,072.

(b)  Forgiveness of Debt Income

ERG's 1987 Form 1120, Schedule L, Balance Sheet, reported under the category assets "Loans to stockholders/officers" of $88,291 as the balance at the beginning and end of that tax year.  For 1988, ERG's Form 1120, Schedule L, filed August 1, 1994, reported no amount for "Loans to stockholders/officers".  On or

---

[38]The parties stipulated that in 1994 $1,072 in dividends was credited to this account.  In fact, the amount credited was $1,072.03.

about July 29, 1994, accountant Bradac sent Burton a letter which stated in part:

> Loans to Stockholders cannot be identified from our workpapers.  If it could be identified, any amounts due from stockholders should be shown here, and the Corporation should make sincere efforts to collect.  Any stockholder who has not repaid a corporate loan has personal income to report if the loan is forgiven by the Corporation.

On October 25, 1995, the Bensons filed their 1994 return.

4.  Transfers From NPI

In 1993, Burton caused NPI to issue:  (1) Check Nos. 424, 439, and 444, totaling $129,480 from NPI's bank account made payable to the California Franchise Tax Board to pay his personal tax liabilities; and (2) check Nos. 423, 425, 432, and 438 from NPI's bank account made payable to the Internal Revenue Service (IRS) to pay his personal tax liabilities, the aggregate amount of which was $378,000.[39]

In 1994, Burton caused NPI to:  (1) Issue check Nos. 452, 462, and 468 totaling $28,745 from NPI's bank account made payable to the California Franchise Tax Board to pay his personal tax liabilities;  (2) issue check Nos. 446, 451, 455, and 461

_____

[39]The parties stipulated that check No. 424 for $81,000 and check No. 444 for $28,480 totaled $129,480, which was obviously an error since these two sums equal $109,480.  It is clear from the documentary evidence in the record that three checks, Nos. 424, 439, and 444 were written from NPI's bank account to the California Franchise Tax Board in the total amount of $129,480. Additionally, it is clear from the evidence that NPI issued checks, Nos. 423, 425, 432, and 438 to the IRS in the total amount of $378,000.

totaling $135,869 to the IRS to pay his personal tax liabilities; (3) issue check Nos. 453 and 457 to himself in the total amount of $200,000; and (4) wire transfer $1 million to First American Title Guaranty Co. for the purpose of funding a $2,213,000 secured promissory note with respect to which Burton and Elizabeth held a 45.188-percent interest as joint tenants.

In 1995, Burton caused NPI to issue: (1) Check No. 469 for $23,331 payable to the IRS to pay his personal tax liabilities; (2) check Nos. 474, 475, 486 in the aggregate amount of $400,000 to himself and/or his wife; (3) check No. 477 for $1 million payable to Jack White & Co. to establish an investment account in the name "Burton O. Benson"; (4) check No. 478 for $1 million payable to USAA Mutual Fund to establish an investment account in the Bensons' names; (5) check Nos. 482 and 485 in the respective amounts of $5,441.55 and $4,860.81 payable to Insight Capital Research & Management, Inc., to establish an investment account; and (6) check Nos. 487, 488, and 489 for $100,000 each to Eric, Brad, and Mark.

5. Baden Spiel Haus Partnership

During the years 1989, 1990, 1993, and 1994, Burton was a partner owning a 25-percent interest in the Baden Spiel Haus partnership. Baden Spiel Haus owned and operated a ski cabin in California. The Bensons claimed partner deductions of $1,281, $1,182, $1,473, and $2,635, for 1989, 1990, 1993, and 1994,

respectively, which respondent denied for lack of substantiation. The Bensons conceded respondent's determination for all years except 1994. See appendix, par. 13.

6. Evelyn Hermsmeier Partnership

During the years 1988, 1989, 1990, and 1993, Elizabeth was a partner holding a 50-percent interest in the Evelyn C. Hermsmeier et al. partnership. Evelyn C. Hermsmeier, f.k.a. E.C. Ford, is the sister of Elizabeth. For the years listed, gross income of the partnership was as follows:[40]

| Tax Year | Gross Income |
| --- | --- |
| 1988 | $263,448 |
| 1989 | 274,683 |
| 1990 | 242,700 |
| 1991 | 282,059 |
| 1992 | 202,192 |
| 1993 | 185,770 |
| 1994 | 201,239 |

7. The Income Tax Returns

(a) The Bensons

On July 25, 1994, the Bensons filed their 1988 Federal income tax return through respondent's revenue agent. The 1988 return was filed after the October 15, 1989, due date, as extended. On September 16, 1994, the Bensons filed their 1989 Federal income tax return through respondent's revenue agent.

___

[40]On brief, respondent indicated that facts pertaining to the Evelyn Hermsmeier Partnership relate "solely to the issue of substantial omission of income pursuant to" sec. 6501(e). Income or loss from the partnership was reported on the Bensons' 1989, 1990, 1993, and 1994 Schs. E as Elizabeth's distributive share.

The 1989 Federal income tax return was filed after the October 15, 1990, due date, as extended.  On October 21, 1994, the Bensons filed their 1993 Federal income tax return.  On February 14, 1995, the Bensons filed their 1990 Federal income tax return through respondent's agent.  The 1990 Federal income return was filed after the October 15, 1991, due date, as extended.

On June 29, 1995, respondent issued Burton a notice of deficiency for the tax years 1991 and 1992.  On October 25, 1995, the Bensons filed their 1994 Federal income tax return.  On November 27, 1995, respondent assessed a deficiency against Burton for the 1992 tax year on the basis of a notice of deficiency dated June 29, 1995.  On December 13, 1995, the Bensons filed their 1991 Federal income tax return.  On January 1, 1996, respondent assessed a deficiency against Burton for the 1991 tax year on the basis of a notice of deficiency dated June 25, 1995.  On March 5, 1997, the Bensons filed their 1992 Federal income tax return.

(b) Eric B. Benson

On or about April 15, 1994, Eric requested an extension of time to file his 1993 Federal income tax return.  On October 17, 1994, Eric filed his 1993 Federal income tax return.  On October 23, 1995, Eric filed his 1994 Federal income tax return.

(c)  <u>Mark D. and Brad D. Benson</u>

Neither Mark nor Brad filed a Federal income tax return for 1993.  On October 25, 1995, Mark and Brad each filed their 1994 Federal income tax return.

(d) <u>ERG</u>

ERG filed its Forms 1120 Federal income tax returns on the dates and for the years listed:

| <u>Date</u> | <u>Tax Year</u> |
|-------------|-----------------|
| 5/23/89 | 1987 |
| 8/1/94 | 1988 |
| 8/28/94 | 1989 |
| 9/18/94 | 1993 |
| 11/20/94 | 1990 |
| 7/16/95 | 1991 & 1992 |

There is a dispute between the parties whether ERG filed a 1994 return.

(e)  <u>NPI</u>

NPI filed its Forms 1120S on the dates and for the years listed:

| <u>Date</u> | <u>Tax Year</u> |
|-------------|-----------------|
| 1/14/91 | 1987 |
| 1/21/92 | 1988 |
| 5/22/92 | 1989 |
| 7/14/92 | 1990 |
| 9/17/92 | 1991 |
| 9/20/94 | 1993 |
| 9/20/94 | Amended 1989 |
| 12/15/94 | Amended 1990 |
| 7/19/95 | 1992 |
| 9/20/95 | 1994 |
| 9/18/95 | Amended 1991 |

8.  The Return Preparers

G.A. "Al" Piepho prepared ERG's and NPI's 1987 returns. Piepho died on or about October 1, 1989.  After Piepho died, Bradac purchased Piepho's accounting practice.  For the tax years beginning in or after 1988 through 1994, Bradac generally prepared the tax returns for ERG, NPI, and each of the petitioners.  However, Jill Toibin, C.P.A. (Toibin), prepared the Bensons' 1992 Form 1040.

9.  Notices of Deficiency

On October 15, 1997, respondent issued Eric a notice of deficiency for his tax year 1993.  On September 10, 1998, respondent issued notices of deficiency to Eric, Mark, and Brad for the 1994 tax year.  On September 13, 2000, respondent issued to the Bensons notices of deficiency for the tax years 1988, 1989, 1990, and 1993.  On September 24, 2001, respondent issued to the Bensons a notice of deficiency for their 1994 tax year.

(a)  Examinations

On November 19, 1996, respondent opened an examination of the Benson's 1993 return.  The examination of the Bensons' 1993 return related to an ongoing examination of ERG, which examination commenced on August 23, 1995.  On March 11, 1997, respondent opened an examination of the 1988, 1989, 1990, and 1994 returns of the Bensons.

OPINION

The gravamen of respondent's argument is that due to a bitter family feud over the control and ownership of ERG, Burton "formed a fraudulent scheme to divert the earnings and profits of ERG to himself (either through NPI or directly) and to thereby lower the reportable profits of ERG." Respondent alleges that Burton labored to reduce ERG's profits because the unbundling agreement required him to pay his brother a multiple of ERG's profits. The alleged scheme, respondent argues, was perpetrated in three ways: (1) Various transactions to divert cash from ERG to NPI; (2) ERG's payment for 143 Alice Lane for the Bensons' benefit; and (3) ERG's direct payment of the Benson family personal expenses. Respondent alleges Burton's scheme was also intended to defraud the Government of income tax due and owing.

The Bensons seek solace in the circumstances surrounding the preparation and filing of their income tax returns. The Bensons allege that the uncertainties associated with the brothers' legal and personal struggle to control the closely held entities, the pressures of running successful and profitable businesses, and the death of their longtime accountant and tax preparer caused their failure to prepare timely and accurate tax returns, not intentional malfeasance.

As discussed in detail below, the voluminous record in this case does not sustain respondent's burden of proving by clear and

convincing evidence that the Bensons fraudulently intended to evade the payment of their income taxes. However, respondent has persuaded us that the Bensons substantially understated their income.

A. The Burden of Proof and the Statute of Limitations

A determination made by the Commissioner in a notice of deficiency is presumed correct, and the taxpayer bears the burden of proving that determination incorrect.[41] Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

Generally, the Commissioner must assess the amount of tax within 3 years after a return is filed. See sec. 6501(a). The Code provides exceptions to this period of limitations. One exception, of course, is for fraud. See sec. 6501(c). In pertinent part, section 6501(c) provides:

SEC. 6501(c). Exceptions.--

(1) False return.--In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time.

---

[41]Sec. 7491(a)(1) provides that the burden of proof shifts to the Commissioner if the taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the tax liability of the taxpayer. Sec. 7491(a)(1) applies to court proceedings arising in connection with examinations commencing after July 22, 1998. See Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3001(c), 112 Stat. 726. The record indicates that the examinations of petitioners' returns began prior to the effective date of sec. 7491. Thus, sec. 7491 is inapplicable to this case. See Seawright v. Commissioner, 117 T.C. 294 (2001).

There is an exception for the substantial understatement of income.  Section 6501(e) provides in pertinent part:

    SEC. 6501(e).  Substantial Omission of Items.--
Except as otherwise provided in subsection (c)--

        (1) Income taxes.--In the case of any tax
    imposed by subtitle A–

            (A) General rule.--If the taxpayer omits
        from gross income an amount properly
        includible therein which is in excess of 25
        percent of the amount of gross income stated
        in the return, the tax may be assessed, or a
        proceeding in court for the collection of
        such tax may be begun without assessment, at
        any time within 6 years after the return was
        filed.  For purposes of this subparagraph–

                (i) In the case of a trade or
            business, the term "gross income" means
            the total of the amounts received or
            accrued from the sale of goods or
            services (if such amounts are required
            to be shown on the return) prior to
            diminution by the cost of such sales or
            services; and

                (ii) In determining the amount
            omitted from gross income, there shall
            not be taken into account any amount
            which is omitted from gross income
            stated in the return if such amount is
            disclosed in the return, or in a
            statement attached to the return, in a
            manner adequate to apprise the Secretary
            of the nature and amount of such item.

Respondent bears the burden of proving by a preponderance of the evidence that:  (1) The Bensons omitted from gross income an amount in excess of 25 percent of the amount of gross income reported on their return, and (2) that the omitted income was properly includable in gross income.  Burbage v. Commissioner, 82

T.C. 546, 553 (1984), affd. 774 F.2d 644 (4th Cir. 1985); Ghadiri v. Commissioner, T.C. Memo. 1996-528; Hittleman v. Commissioner, T.C. Memo. 1990-325, affd. without published opinion 945 F.2d 409 (9th Cir. 1991).  Accordingly, respondent must introduce affirmative evidence to meet his burden.  Ghadiri v. Commissioner, supra.  On brief, the parties agree that our opinion on the merits will determine whether the period of limitations bars respondent's assessment for 1989, 1990, 1993, and 1994.

For respondent to prevail with respect to the 1988 taxable year, we must find fraud, which we do not.  However, as discussed infra, we do find that respondent has proved substantial omissions of income in 1989, 1990, 1993, and 1994.  The Bensons argue on brief that the only way respondent can show a 25-percent omission is by proving that they had constructive dividends.  We have found that substantial constructive dividends were received.  On brief, respondent refers to this matter as a computational issue.  A recomputation of the Bensons' income under Rule 155 pursuant to our findings and holdings herein will control whether the Bensons omitted from gross income an amount which is in excess of 25 percent of the amount of gross income stated in the returns.  If there was such an omission the period of limitations in section 6501(a) will not bar assessment for those years.  See

Garden State Dev., Inc. v. Commissioner, 30 T.C. 135, 142 (1958); Hulshart v. Commissioner, T.C. Memo. 1955-231.

B.  Constructive Dividends

The heart of respondent's imputation of income is that numerous ERG expenditures and transfers constitute constructive dividends to the Bensons.  On the contrary, petitioners argue that if the percentage of NPI's ownership declared in the final arbitration decision is considered, petitioners overpaid their income tax liability.

The Commissioner is authorized and has great latitude in reconstructing income in accordance with any reasonable method that accurately reflects actual income.  Secs. 446(b), 6001; Petzoldt v. Commissioner, 92 T.C. 661, 687 (1989); Meneguzzo v. Commissioner, 43 T.C. 824, 831 (1965); see Taglianetti v. United States, 398 F.2d 558, 562 (1st Cir. 1968), affd. on other grounds 394 U.S. 316 (1969); Ramsey v. Commissioner, T.C. Memo. 1980-59; Bolton v. Commissioner, T.C. Memo. 1975-373.  The reconstruction of a taxpayer's income need only be reasonable in light of the surrounding facts and circumstances.  Giddio v. Commissioner, 54 T.C. 1530, 1533 (1970); Schroeder v. Commissioner, 40 T.C. 30, 33 (1963).  Furthermore, it is axiomatic that "The Commissioner and the reviewing courts are permitted to fully examine any transaction to determine its economic and financial reality." Noble v. Commissioner, 368 F.2d 439, 443 (9th Cir. 1966), affg.

T.C. Memo. 1965-84.  Those transactions which lack economic substance may be ignored.  Gregory v. Helvering, 293 U.S. 465, 467 (1935); Muhich v. Commissioner, 238 F.3d 860, 864 (7th Cir. 2001), affg. T.C. Memo. 1999-192.

Section 61(a) defines gross income as "all income from whatever source derived".  The regulations demonstrate the definition's expanse:  "Gross income includes income realized in any form, whether in money, property, or services."  Sec. 1.61-1(a), Income Tax Regs. (emphasis added); see Han v. Commissioner, T.C. Memo. 2002-148 (citing Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955)).  As the Supreme Court explained, a gain "constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it."  Rutkin v. United States, 343 U.S. 130, 137 (1952).

Section 301, however, qualifies the definition of gross income.  Barnard v. Commissioner, T.C. Memo. 2001-242. Generally, that section provides that funds distributed by a corporation over which the taxpayer/shareholder has dominion and control are taxed under the auspices of section 301(c).  Id. Pursuant to section 301(c), a dividend is taxed as ordinary income only to the extent of the distributing corporation's

earnings and profits;[42] any excess is nontaxable return of capital to the extent of the taxpayer's basis; and any remaining amount received is taxable as capital gain from the sale or exchange of a capital asset. Sec. 301(c)(1),(2), and (3); Truesdell v. Commissioner, 89 T.C. 1280, 1295-1298 (1987); Barnard v. Commissioner, supra. The parties have stipulated that, to the extent we find constructive dividends, ERG had sufficient earnings and profits to deem any distributions as ordinary income.

"It is well established that transfers between related corporations may result in constructive dividends to a common shareholder." Speer v. Commissioner, T.C. Memo. 1996-323 (citing Joseph Lupowitz Sons, Inc. v. Commissioner, 497 F.2d 862, 868 (3d Cir. 1974), affg. in part, revg. in part on another ground, and remanding T.C. Memo. 1972-238); see DiLeo v. Commissioner, 96 T.C. 858, 883 (1991), affd. 959 F.2d 16 (2d Cir. 1992). "A greater potential for constructive dividends * * * exists in closely held corporations where dealing between stockholders and the corporation are commonly characterized by informality." Zhadanov v. Commissioner, T.C. Memo. 2002-104. However, common ownership alone will not support a finding of constructive dividends. Sammons v. Commissioner, 472 F.2d 449, 451 (5th Cir.

_____

[42]The determination and calculation of earnings and profits is governed by sec. 316 and the regulations promulgated thereunder.

1972), affg. in part and revg. in part on another ground T.C. Memo. 1971-145.

"Corporate expenditures constitute constructive dividends only if 1) the expenditures do not give rise to a deduction on behalf of the corporation, and 2) the expenditures create 'economic gain, benefit, or income to the owner-taxpayer.'"  P.R. Farms, Inc. v. Commissioner, 820 F.2d 1084, 1088 (9th Cir. 1987) (quoting Meridian Wood Prods. Co. v. United States, 725 F.2d 1183, 1191 (9th Cir. 1984)), affg. T.C. Memo. 1984-549.  "The crucial concept in a finding that there is a constructive dividend is that the corporation has conferred a benefit on the shareholder in order to distribute available earnings and profits without expectation of repayment."[43]  Truesdell v. Commissioner, supra at 1295 (citing Noble v. Commissioner, supra at 443).  A "constructive dividend" is "simply a corporate disbursement that is a dividend in the contemplation of law though not called such

---

[43]       "To constitute a distribution taxable as a dividend, the benefit received by the shareholder need not be considered as a dividend either by the corporation or its shareholders, declared by the board of directors, nor other formalities of a dividend declaration need be observed, if on all the evidence there is a distribution of available earnings or profits under a claim of right or without any expectation of repayment."  * * *

Noble v. Commissioner, 368 F.2d 439, 443 (9th Cir. 1966), affg. T.C. Memo. 1965-84 (quoting Clark v. Commissioner, 266 F.2d 698, 711 (9th Cir. 1959)).

by the corporation making the disbursement." United States v. Mews, 923 F.2d 67, 68 (7th Cir. 1991). Furthermore, to be a constructive dividend to a shareholder, the corporation need not pay it directly to the shareholder. Id.

It is clear that when a corporation confers an economic benefit upon a shareholder without expectation of reimbursement, that economic benefit becomes a constructive dividend. Loftin & Woodard, Inc. v. United States, 577 F.2d 1206, 1214 (5th Cir. 1978); Thorpe v. Commissioner, T.C. Memo. 1998-115. For example, the amount of taxes paid by a corporation on behalf of and for the benefit of a shareholder was held to be a constructive dividend. Inland Asphalt Co. v. Commissioner, 756 F.2d 1425 (9th Cir. 1985), affg. T.C. Memo. 1982-463. Corporate payment of a shareholder's personal expenses constituted a constructive dividend. Dobbe v. Commissioner, 61 Fed. Appx. 348 (9th Cir. 2003), affg. T.C. Memo. 2000-330. Payments by a corporation for painting and repairs made to a shareholder's family residence and travel expenses incurred for personal purposes were deemed to be constructive dividends. Grossman v. Commissioner, 182 F.3d 275 (4th Cir. 1999), affg. T.C. Memo. 1996-452; Noble v. Commissioner, 368 F.2d 439 (9th Cir. 1966). And use of a corporate-owned luxury automobile for personal purposes constituted a constructive dividend. Mohan Roy, M.D., Inc. v. Commissioner, T.C. Memo. 1997-562, affd. 182 F.3d 927 (9th Cir. 1999).

"In determining whether or not the expenditure related to the business of the corporation, we must ascertain whether the payment or expenditure has independent and substantial importance to the paying corporation." Gow v. Commissioner, T.C. Memo. 2000-93 (citing T.J. Enters., Inc. v. Commissioner, 101 T.C. 581 (1993)), affd. 19 Fed. Appx. 90 (4th Cir. 2001). "An expenditure generally does not have independent and substantial importance to the distributing corporation if it is not deductible under section 162." Id. (citing P.R. Farms, Inc. v. Commissioner, supra.)

Respondent determined that numerous transactions constituted constructive dividends to the Bensons. For ease of discussion, we shall separately detail each item and then describe the economic benefit the Bensons received from those items.

1. ERG Transfers to NPI

Transfers made by ERG to NPI and the amounts reported for the years 1988 through 1994 are listed as follows:

| Year | ERG Transfer to NPI | Amount Reported by NPI | Amt. Reported on Shareholder Return | Reporting Shareholder |
|------|------|------|------|------|
| 1988 | [1]$180,000 | -- | -- | n/a |
| 1989 | 483,098 | $248,097 | $165,481 | The Bensons |
| 1990 | -- | 193,508 | 129,070 | The Bensons |
| 1991 | -- | 1,764,049 | 757,025 | The Bensons |
| 1992 | -- | 907,443 | 365,754 | The Bensons |
| 1993 | 3,600,000 | 220,000 | 146,667 | The Bensons |
| | | | 24,444 | Eric Benson |
| 1994 | 160,063 | 160,063 | 80,032 | The Bensons |
| | | | 26,677 | Eric Benson |
| | | | 26,677 | Brad Benson |
| | | | 26,677 | Mark Benson |
| Total | 4,423,161 | 3,493,160 | 1,748,504 | |

[1]Petitioners offered no evidence as to this transfer. Furthermore, Burton could not recall the purpose of the transfer.

As found above, in 1989 ERG transferred $483,098 to NPI with respect to the MOA. Although there was conflicting testimony concerning what was contemplated by the MOA,[44] petitioners offered no evidence of what specific services, if any, were performed and/or what equipment, if any, was purchased. Mr. Bradac, Burton's accountant and return preparer, testified that Burton informed him that no equipment was purchased, and he instead booked the payment as a security deposit.

Generally, money was transferred from ERG to NPI ostensibly for two reasons. First, in accordance with the exclusive license agreement between ERG and NPI, 10 percent of ERG's profits flowed to NPI in the form of royalties.[45] Second, to achieve Burton's goal of having ERG show a paper profit of approximately $75,000 per year, the difference between the purported royalty payments and ERG's actual annual profit (less approximately $75,000) was transferred as payment to NPI for purported engineering services performed by NPI.

---

[44]Warren Timothy, a former employee of Hercules, testified that the MOA was a purchase contract, and it did not contemplate reengineering. Similarly, William Morton, also a former employee of Hercules, testified that the MOA was an equipment purchase contract. However, Bryan Leyda, an ERG employee, testified that the schedule attached to the MOA was his "personal best estimate" for time and engineering to design the assembly, the modifications, and the installation, and any debugging processes.

[45]The payments were labeled "royalties" on the basis of information that Burton provided. Bradac did not see a copy of the royalty agreement until after he prepared the returns.

The realization of the "plan" is demonstrated in a stipulated exhibit. For example, in 1992 ERG had $2,704,096 in total sales and allocated $275,867 in royalties to NPI.[46] Similarly, in 1993 ERG had total sales of $2,440,139 and allocated $244,023 in royalties to NPI.[47] ERG reported a profit in 1989, 1990, and 1993 of $77,930, $79,576, and $76,941, respectively.

Because many of ERG's payments to NPI were made after the purported royalties and engineering services were supposedly earned, there had to be a plan or basis upon which the funds were attributed to the tax years at issue.[48] At trial, Mr. Bradac

[46]NPI's original 1992 return reported royalty income of $907,443.

[47]NPI's original 1993 return reported royalty income as $220,000.

[48]Jill Toibin, C.P.A., prepared the Bensons' 1992 Form 1040. On or about Oct. 3, 1996, Toibin wrote a memorandum to her file which states in pertinent part:

> I asked Burt if all disbursements from ERG were ordinary and necessary business expenses of the corporation and he confirmed in the positive. He indicated that the corporation has a royalty agreement with New Process Industries (a related corporation). In addition, New Process provides services to ERG through the action of the employee owner (himself) that are not covered by the rent agreement, so that engineering services are paid to compensate the corporation for these services.

At trial, Toibin testified that the classification of engineering services was on the basis of Burton's representations that he provided "know-how, show-how, something of value to NPI".

explained the "plan": "And not having exact numbers to work with, I suggested that we allocate the numbers based upon the income of the corporation. When we get down to the end, we'll take whatever difference there is and put it into the middle years." The theory of allocating ERG payments for tax years prior to payment was further refined in Jill Toibin's letter to the California Franchise Tax Board:

> The corporation [NPI] receives royalties and performs engineering services for a related entity * * * [ERG]. The corporation is a cash basis taxpayer. However, the corporation was <u>required</u> to report as current income any amounts constructively received, even though such amounts were not actually paid in the current year. * * *

During trial, Bradac was asked and answered as follows:

> Q: Okay. Now was there a discussion at some point between you and Admiral Benson of a desire to flow profits from ERG to NPI?
>
> A: I mean I don't think of it in those terms, but yes, I guess there would be discussion which entailed that.
>
> * * * * * * *
>
> Q: Did you specifically recall, do you recall having conversations with Admiral Benson about trying to keep the profits of ERG down?
>
> A: Yes.
>
> * * * * * * *
>
> Q: Did you have an understanding from Admiral Benson that more of the profits of ERG could be passed, or flowed to New Process through increasing deductions on ERG's returns?

A:    I vaguely recall having some discussions like increasing the rents, and along those lines, yes.

Q:    And in those discussions, do you recall discussing performing services as another way that ERG's profits might flow to NPI?

A:    Probably.

Q:    And if those profits flowed from ERG to NPI, then would ERG appear less profitable?

A:    Yes.

Q:    At least on paper?

A:    Yes.

Q:    Do you recall a discussion or discussions with Admiral Benson in which Admiral Benson expressed a desire to keep the profits of ERG for any given year, to a level of about $75,000 – excuse me, did I say profits?  I meant taxable income.

A:    We have [sic] a conversation along those lines.

Similarly, on or about April 13, 1993, Burton sent Bradac a memorandum which states in pertinent part:

ERG  1) ERG had an estimated profit of $757,000 for yr-end 1992.

2) Assume ERG pay [sic] royalties to NPI of $750K for this period.

3) Then ERG has minimal to no tax for Fed & state in 92.

NPI  1) NPI has a est. profit of $750K from ERG plus $68K self made profit equals $818K for 1992.

2) Assume $818K flows to BOB somehow royalty, profit, salary, this yet to be determined.

3) Then NPI has no Fed tax but has CA State of 2 1/2% of profit * * *

Burton testified that this memorandum was "a tax planning document".  Similarly, on or about March 7, 1996, Burton sent a memorandum to Bradac stating:  "Considering that we desire to keep ERG at a profit of about $75K, we would then pull about $260K out of ERG and allocate it to NPI."  (Emphasis added.)

Petitioners produced purported "invoices" for the royalties paid only with respect to 1993.  The invoices are printed on NPI's letterhead, addressed to ERG, and show an amount "due".  Each document is stamped "RECEIVED" by ERG on a specific date and bears a "paid" stamp showing an amount, date, and check number.  However, these invoices were not created contemporaneously with payment and/or the receipt of services, but they were prepared in response to a meeting Burton had with a revenue agent.

Burton testified that the "engineering services" for which ERG compensated NPI were consulting design services that he performed to make the Hercules contract "work".  He stated:  "The engineering services I'm referring to was the understanding between ERG and NPI in light of the agreement that ERG had with NPI to do the design services, to change the D-5 process, and scale up to the delivery rate that the customer wanted."  He stated that the payments were for his "engineering know-how".  However, there was no written agreement between ERG and NPI concerning the provision of engineering services.

The record also includes purported invoices for engineering and design services for only 1993. The documents state in pertinent part:

> Engineering and Design Services for Hercules Aerospace, as Prime Contractor to the Department of Defense authorization to ERG for the investment in the Facilitization and Plant Equipment required to obtain the contract delivery rate requirements under Hercules Classified Contract No. 2257-003136 as line item 1 and under Hercules Classified Contract No. 2295-03020 as line item 2, for the Fleet Ballistic Missile Program "Special" D-5 tooling requirements.

The documents are written on NPI's letterhead, addressed to ERG, and bear the last day of each month in 1993 as the date. Additionally, the documents are stamped "RECEIVED" on a certain date by "ERG, Inc." and are also stamped "paid" showing an amount, date, and check number. Burton admitted, however, that these invoices were created shortly before an audit meeting with a revenue agent.

Burton testified that he kept track of the hours he spent performing the purported design and engineering services on his desk calendar.[49] In answering a question concerning how much NPI charged ERG for his alleged services, he testified: "I'd be guessing, 200, 300 dollars an hour, something like that." Burton was asked and answered as follows:

> Q: And how would you make that calculation, if you didn't keep specific hours on your desk calendar?

---

[49]The desk calendar was not proffered as evidence.

A:   You know I really don't know.  They seem like very round numbers.  They could be just what we in the business call engineering estimates.

However, Burton presented no evidence detailing precisely what services he provided, the number of hours he spent performing those services, and whether the compensation charged was ordinary and reasonable in the industry.  Clearly, Burton controlled both sides of the "table" with respect to ERG and NPI.  Transactions between related corporations are inherently suspect.  Tulia Feedlot, Inc. v. United States, 513 F.2d 800, 805 (5th Cir. 1975) ("Transactions between related taxpayers or between a close corporation and its principals * * * must be subject to close scrutiny." (citing United States v. Ragen, 314 U.S. 513 (1942))); Ludwig Baumann & Co. v. Commissioner, T.C. Memo. 1961-271 ("common ownership factor requires a close scrutiny to determine the substance of the transaction and whether it reasonably would have been made between parties dealing at arm's length."), affd. 312 F.2d 557 (2d Cir. 1963).

Furthermore, we infer from the evidence that the exclusive licensing agreement was merely a tax planning tool, completely lacking in economic substance.  Although taxpayers are entitled to structure their transactions in such a way to achieve the most advantageous tax ramifications, nonetheless, those transactions must be real and have economic substance.  Gregory v. Helvering, 293 U.S. at 469.  For example, the exclusive licensing agreement

was entered into in 1990 but had retroactive application to 1987, the year during which Burton took sole control of ERG.  The amounts that ERG transferred to NPI were not regular.  As the arbitrators found, the pattern of payment demonstrates that Burton was merely funneling ERG's profits to NPI.  There is no evidence of a business purpose why ERG would "sell" its valuable patent rights to NPI and simultaneously license them back.  Furthermore, there is no evidence whether ERG received the consideration contemplated by the agreement for "selling" those rights.  The agreement states that ERG is entitled to, inter alia, 50 percent of the moneys NPI receives from licensing the patent rights.  ERG ostensibly was "licensing" those patent rights under the agreement and paying NPI hundreds of thousands of dollars for such rights.  However, the record shows only the unidirectional flow of money from ERG to NPI.

ERG transferred millions of dollars to NPI for payment of supposed "engineering services".  However, there is no evidence of what services Burton performed on behalf of NPI other than his testimony that he provided ERG with engineering "know how".  No third party testified as to what Burton specifically did.  There is no evidence of how much time he devoted to this endeavor and whether the amounts charged were reasonable and customary.  In fact, we infer from the evidence that in conjunction with the exclusive licensing agreement, the label "engineering services"

was created to achieve Burton's goal of having ERG show a consistent paper profit of approximately $75,000.[50]  For example, ERG's records show that in 1991 ERG incurred $1,539,463 for "engineering services" provided by NPI.  Assuming, as Burton testified, that NPI charged ERG $300 per hour, Burton would have had to spend 5,131.5 hours or 213.8 twenty-four hour periods performing so-called engineering services.

On brief, petitioners argue that the percentage of ownership determined in the arbitration decisions affects the issue of what amount, if any, constitutes taxable income to the Bensons.  Petitioners direct the Court's attention to the arbitrators' finding that Burton owned one-third of NPI's stock during the years at issue.  Thus, petitioners conclude, if one-third of the distributive share rights in NPI is considered, the Bensons overpaid their income tax liability.  We disagree.

The fact that Burton did not actually own 100 percent of NPI during the years at issue does not affect our holding that those ERG funds transferred to NPI constituted constructive dividends to Burton.  The arbitrators found and the parties agree that during the years at issue, Burton maintained sole operating

---

[50]On brief, petitioners argue:  "The allocations of income to NPI for the engineering services that Burton performed for ERG respecting the Hercules contract were legitimate business accounting decisions."  (Emphasis added.)

control of ERG and NPI.[51] The record clearly demonstrates that ERG funds transferred to NPI were used for Burton's family's economic benefit and otherwise lacked a business purpose.

Furthermore, petitioners argue: "Respondent has not presented compelling evidence that Burton appropriated NPI's bank accounts to his own benefit." Again, we disagree. The record demonstrates, and indeed as the arbitrators also found, that Burton transferred ERG money to NPI and then used this money for the sole and exclusive benefit of himself and his family. Glendon received no benefit from his determined ownership rights in NPI or ERG until after the final arbitration decision. As he testified, after June 1987 neither he nor Aker had any involvement with ERG. That issue was at the very heart of the brothers' dispute during the arbitration proceedings.

As we discuss infra, the Bensons received a substantial economic benefit from the ERG funds transferred to NPI. Accordingly, we find and hold[52] that the ERG transfers to NPI

---

[51]Petitioners asked us to find as fact that:

> All of the funds at issue that were transferred from ERG to NPI were deposited in an NPI bank account * * * over which Burton exercised sole authority and control as president of NPI responsible to its shareholders. [Emphasis added.]

[52]Our use of the term "find and hold" in this opinion means that we have determined that a preponderance of evidence supports our conclusion.

constituted constructive dividends to Burton in the year of transfer.

2. ERG-Recreation Fund Account

Respondent submitted copies of canceled checks and bank statements for the ERG-Recreation fund account. Petitioners conceded that many of the ERG-Recreation fund account items constituted constructive dividends to Burton. See appendix, par. 7. Melody Carter, ERG's administrative assistant, testified that this account was funded with moneys that ERG received "from recycling cans, recycling cardboard, refunds", etc. She stated: "I'll apply for the refund; the refund will go into that fund." She also testified that this account was used to "purchase baseball tickets, to purchase Christmas parties, company picnic, weight room equipment, things of that nature."[53]

Respondent demonstrated that Burton was the sole signatory for this account and withdrew funds from this account. In addition to the canceled checks proffered by respondent and Burton's concessions, the Court notes that the Bensons failed to provide evidence that any specific amounts withdrawn were used for ERG's business purposes. In fact, the checks at issue provide a contrary inference that the ERG-Recreation fund was

---

[53]Burton testified that at least one ERG Christmas party was not paid from this account but was instead charged to a corporate credit card. See discussion infra. There is no indication that funds from this account were used to pay this bill.

used for personal expenses.  For example, in 1993, check No. 31 is made payable to ERG Retirement Trust for $8,000; similarly, in 1994 Burton issued two checks for expenses relating to his sailboat, Risktaker, a check to Berkeley Yamaha, and checks to various individuals.  In the face of the above facts and concessions, the Bensons failed to substantiate any of the expenses for which checks were written from this account and otherwise failed to demonstrate a business purpose for any of the expenditures.  Accordingly, we find and hold that, in addition to the amounts conceded, Burton received and failed to report constructive dividends in 1993 and 1994 of $8,000 and $2,698, respectively.

### 3. Payment for 143 Alice Lane

The parties do not dispute that in 1990 ERG paid $336,500 for the real property described as 143 Alice Lane and held that property in the name "ERG Retirement Trust".  Petitioners did not object to respondent's requested finding of fact that the purchase of 143 Alice Lane gave the Bensons "a large, uninterrupted piece of land behind and abutting their personal residence."

The Bensons' only argument is that they did not receive a personal benefit until 1997, a year not before the Court, when the ERG Retirement Trust deeded the property to the Bensons in their individual capacities for no consideration.  We disagree.

The facts indicate that the property was purchased to enhance the Bensons' personal residence. The fact that it was finally deeded to the Bensons merely confirms this.

Clearly, the Bensons received a personal and economic benefit when ERG purchased 143 Alice Lane. They had the exclusive use of real property, and eventually the title, for which they paid no consideration. We find and hold that ERG's payment in 1990 for 143 Alice Lane was a constructive dividend to Burton. We also find and hold, under the same reasoning, that ERG's payment of property taxes, $3,879 in 1993 and $8,196 in 1994, also constituted constructive dividends to the Bensons.

4. ERG Check to Burton (Ref. Carroll)

According to a 1989 petition for confirmation of an arbitration award, Burton owed Mr. Carroll $96,748.98, plus interest thereon. In 1989, ERG issued a check payable to Burton for $96,748.98, on which is written "for Michael B. Carroll". With these funds, Burton purchased a cashier's check in the amount of $97,467.21 made payable to Mr. Carroll. The Bensons offered no evidence or explanation concerning this check other than stating that ERG was also named as a defendant in that suit. However, the fee arbitration award names only Burton as a defendant. Indeed, we infer from the recitation of the facts that the representation involved a personal and noncorporate matter between the brothers. The petition for confirmation of

- 61 -

arbitration award and entry of judgment states: "Carroll provided * * * advice and services as an advocate for Benson." In fact, ownership and control of ERG and NPI was the issue for which Mr. Carroll provided legal services.

The payment by a corporation of personal expenses of a shareholder constitutes a constructive dividend. See Inland Asphalt Co. v. Commissioner, 756 F.2d 1425 (9th Cir. 1985); Noble v. Commissioner, 368 F.2d 439 (9th Cir. 1966). Accordingly, we find and hold that Burton received a constructive dividend in 1989 of $96,748.98.

5. Automobile Expenses

ERG claimed the following amounts as deductions for automobile and truck expenses for the years as stated:

| Tax Year | Amount of Deduction |
| --- | --- |
| 1989 | $10,624 |
| 1990 | 23,676 |
| 1993 | 28,308 |
| 1994 | 14,723 |

The parties stipulated that the $15,000 and the $13,500 that ERG paid in 1990 and 1993, respectively, to purchase vehicles for Eric and Mark were constructive dividend income to Burton. See appendix, par. 4. Respondent argues that the balance constitutes constructive dividend income to Burton.

Petitioners failed to substantiate any of the expenses claimed and offered no evidence detailing the percentage that the automobiles and trucks were used for business purposes. See

Mohan Roy, M.D., Inc. v. Commissioner, T.C. Memo. 1997-562.
Indeed, Burton admitted that possibly some of the automobile
expenses were spent on his family's cars. The Bensons have
failed to meet their burden of proving error in respondent's
determination with respect to the amounts still in issue.[54] We
hold that, in addition to the amounts conceded, Burton had
constructive dividend income in 1989, 1990, 1993, and 1994 of
$10,624, $8,676, $14,808, and $14,723, respectively.

6. Charitable Contributions

Because respondent has conceded that ERG's payments of
$6,000, $6,000, $6,000, and $13,500 in 1989, 1990, 1993, and 1994
to Moraga Valley Presbyterian Church (MVPC) are not constructive
dividends, the Bensons are not entitled to deduct these amounts
on their personal returns. See sec. 170(a)(1); sec. 1.170A-1(a),
Income Tax Regs. Additionally, respondent conceded that a $2,000
ERG check to Camp Timberwolf in 1994 was not a constructive
dividend to the Bensons. Thus, the Bensons are not entitled to
deduct this donation.[55] See sec. 170(a)(1); sec. 1.170A-1(a),

_____

[54]We do not find that respondent has affirmatively proven
that the amounts in issue are constructive dividends.

[55]There appears to be a scrivener's error in respondent's
opening brief. Respondent argues: "Finally, with respect to the
1994 check for $2,000 paid to Camp Timberwolf * * * respondent
has conceded that this amount was not a constructive dividend to
* * * [the Bensons]. Therefore, ERG's charitable contribution to
Camp Timberwolf should be allowed as an itemized deduction on the
Bensons' 1994 return." Given respondent's first argument that to
(continued...)

Income Tax Regs. Petitioners appear to concede the deductibility issue as they advance no argument.

The only remaining matter of contention is whether an ERG check issued on December 31, 1992, for $50,000 made payable to the Bank of America constituted a constructive dividend to the Bensons. Burton used these funds to purchase a $50,000 cashier's check from the Bank of America made payable to MVPC. The check lists Burton as its purchaser. The Bensons, and not ERG, claimed a $50,000 deduction on their 1993 return. Burton testified that the donation was from him and not ERG. At trial, Burton explained that MVPC "put on both the non-negotiable receipt, they put B.O. Benson and on the face of the [cashier's] check they put B.O. Benson. The reason, Your Honor, I put it on, I wanted to ensure they knew where it came from." Accordingly, we find and hold that the Bensons received a $50,000 constructive dividend in 1993 and hold that they are entitled to a charitable deduction for the amount of the donation. See sec. 170(a)(1); sec. 1.170A-1(a), Income Tax Regs.

7. Excess Rent Paid by ERG Re: Stanford Plant

Throughout the years 1988 to 1994, ERG occupied the Stanford plant and paid rent to NPI for its use. The unbundling agreement

---

[55](...continued)
the extent that amounts paid by ERG are not constructive dividends to the Bensons they should not also receive the benefit of the deduction, we presume that respondent inadvertently omitted the word "not" between "should" and "be".

contemplated that the parties would enter into a lease on the Stanford plant for 8 years for "$5,000 (or $5,500 per month)". A commercial lease for this property was prepared but never executed. According to this unexecuted document, for a period of 8 years commencing March 1988, ERG was to pay NPI $5,000 per month for the use of the Stanford plant.

For 1988 and 1989, ERG paid NPI $5,159 per month for the use of the Stanford plant. This monthly amount paid remained unchanged until August 15, 1990, when ERG paid NPI $26,159 that month. For the last 4 months of 1990 the monthly amounts paid were $8,159, $8,159, $14,159, and $8,159, respectively. In 1993 and 1994, ERG paid NPI $9,380 and $10,787 per month, respectively.

Respondent determined that part of the money, $40,067, $46,560, and $63,444, ERG paid to NPI as rent for the Stanford plant in 1990, 1993, and 1994, respectively, constituted constructive dividends to the Bensons.[56] Thus, it appears that respondent is arguing that the amount of rent paid in excess of $5,500 per month constitutes constructive dividends.

The maximum monthly lease amount listed in the unbundling agreement apparently reflected the product of an arm's-length

---

[56]See _supra_ p. 5, table, note 2.

negotiation between the two warring brothers.[57]  Under these
circumstances, this is the best indication of the intent of the
parties and the value of the use of the property at that time.
Helba v. Commissioner, 87 T.C. 983 (1986), affd. without
published opinion 860 F.2d 1075 (3d Cir. 1988); see Zirker v.
Commissioner, 87 T.C. 970 (1986).  Furthermore, the "excess rent"
ERG paid pooled money in NPI, which as we later discuss, was used
for the Benson family's economic benefit.  Accordingly, we find
and hold that Burton had constructive dividend income of $40,067,
$46,560, and $63,444 in 1990, 1993, and 1994, respectively.

8.  ERG Payments to NPI for Rent on Lowell Plant

In the unbundling agreement the brothers agreed to enter
into an 8-year lease with respect to the Lowell plant, which was
to provide that Glendon would pay NPI $2,000 per month.  In 1988,
a confirming commercial lease was prepared but not executed.
This lease agreement was for a term of 8 years to commence in
March 1988 and provided for a rental payment by "Acker [sic]
Industries, Inc." of $2,000 per month.

During the years at issue, neither Glendon nor Aker paid
rent to NPI for use of the Lowell plant.[58]  Instead, ERG paid

---

[57]Respondent requested the Court to find that the unbundling
agreement was "the result of intense arm's-length bargaining".
Petitioners failed to object to this requested finding.

[58]Glendon explained why he failed to pay rent:

(continued...)

rent to NPI on behalf of Glendon/Aker. Burton testified that during the arbitration proceedings, it was ERG's responsibility to pay Aker's rent obligation since it was still, at least until a final resolution was achieved, ERG's research and development division.

The arbitrators in their final decision found that "the rent that should be paid by GMB [Glendon]/Aker to NPI is $2,000 per month from July 1, 1987 to December 31, 1994 and $2,500 per month" thereafter. And in fact, Glendon did pay such rent via a credit to the amount the arbitrators decided Burton owed him.

Respondent argues that ERG had no duty to pay NPI $31,850, $29,400, $29,400, $31,020, and $41,736 in 1988, 1989, 1990, 1993, and 1994, respectively, for Aker's use of the Lowell plant and that those payments constituted constructive dividends to the Bensons.[59] We agree with respondent that ERG had no contractual

_____

[58](...continued)
I knew that the performance on the [unbundling] agreement required payment of rent. * * * [But it] also required my brother to advance money to satisfy the terms of that agreement. I was not going to pay rent until my brother satisfied his monetary agreement, or commitments.

[59]Respondent determined these amounts in the notices of deficiency. However, in a stipulated exhibit, the parties agreed that ERG paid NPI $31,850, $26,950, $31,850, $33,840, and $38,296 during the years at issue, respectively, as rent for the Lowell plant. But see supra p. 25, table, note 1. From the evidence and argument presented, we cannot determine why there is a discrepancy between the amounts that respondent determined and the amounts the parties stipulated. Thus, we assume the parties

(continued...)

obligation to pay Aker's rent obligations. Indeed, it was, as the arbitrators concluded, Aker's responsibility to pay NPI for the use of the Lowell plant, which Glendon ultimately paid by virtue of the final arbitration decision. This, of course, is in accord with what the brothers agreed in the unbundling agreement. Given that these funds were transferred to NPI, which the Bensons used for their personal benefit, see infra, we find and hold that the Bensons received constructive dividends in the amounts of the excess rents that ERG paid.

### 9. Director's Fees

During the years at issue, ERG paid moneys to Esther, Elizabeth, Mark, Brad, and Eric as purported director's fees. Additionally, in 1994, Burton altered the date on a $12,000 check previously issued to his mother and negotiated it shortly after her death. Burton testified that this check also represented director's fees paid to his mother. Respondent argues that all these payments represent constructive dividends to Burton. We agree with respondent.

At trial, Burton generally testified that his family members were directors of ERG, that ERG held meetings from time to time, and that the purported directors performed services for ERG. However, he did not testify what services the purported directors

---

[59](...continued)
will resolve the difference in their Rule 155 computation.

performed, and there is no evidence when and how often board meetings were held. No minutes of these alleged board meetings were proffered as evidence. Furthermore, ERG did not issue Forms 1099, and generally, none of the purported directors reported the income on their individual returns.[60]

The "Transfer of income within the family presumably benefits both transferor and transferee." P.R. Farms, Inc. v. Commissioner, 820 F.2d at 1089-1089 (citing Helvering v. Clifford, 309 U.S. 331, 335 (1940)). In P.R. Farms, Inc. v. Commissioner, supra, the majority shareholder of a corporate taxpayer structured his business affairs to, inter alia, shuttle money to his children.[61] The court found the business arrangement gratuitous and held that the corporation could not deduct the transfers as ordinary and necessary business expenses, and the amounts transferred were constructive dividends to the shareholder. Id. at 1088. A similar result is appropriate here.

There is no evidence what services the purported directors performed on behalf of ERG, when the meetings were held, and

_____

[60]However, Eric did report the fees received in 1994 on his 1994 return.

[61]In P.R. Farms, Inc. v. Commissioner, 820 F.2d 1084 (9th Cir. 1987), affg. T.C. Memo. 1984-549, the taxpayer owned and operated fruit orchards (orchards company). The 91-percent shareholder, president, and director of the orchards company incorporated a fruit packing corporation (packing company) owned by the shareholder's four children. The packing company was formed to assume responsibility for packing the orchards company's fruit in exchange for fees.

whether the amounts paid to the purported directors were reasonable and customary in the industry. This appears to be just another instance where Burton channeled funds from ERG for personal reasons. Accordingly, we find and hold that Burton had constructive dividend income of $6,000, $23,000, $42,000, and $49,000 in 1989, 1990, 1993, and 1994, respectively.

10. Townsend & Townsend Check

The parties stipulated that the law firm Townsend & Townsend issued ERG a check for $15,000 dated January 14, 1994, which Burton negotiated in favor of an insurance company. The funds were credited to an insurance policy against which Burton had previously taken loans. Additionally, the parties stipulated that during the years at issue, Elizabeth was the primary beneficiary of the insurance policy. The beneficiary was not changed to ERG until sometime in 1996. At trial, Burton testified that when the insurance policy was purchased, it was a mistake to designate his wife as the primary beneficiary; he thought the policy was a "key man" policy owned by ERG. Burton testified that the loan proceeds originally taken against the policy were used to meet ERG's payroll.

There is no evidence, save Burton's self-serving testimony, that the funds were used for the benefit of ERG. The record, instead, demonstrates that two loans were taken against the insurance policy in 1975 and 1984 which totaled approximately

$15,000. Indeed, the policy was not for the benefit of ERG but for the Bensons. If Burton had died after repayment, Elizabeth would have received $15,000 more as a death benefit than if the loans had not been repaid. Accordingly, we find and hold that the $15,000 was a constructive dividend.

11. Travel Expenses

On brief, respondent concedes that the Bensons did not have constructive dividend income with respect to items of expense Burton substantiated. Respondent concedes the following items on the basis of Burton's explanation at trial: Karim Cycling $16.24, Surf Berkeley $56.40, and Claremont Resort $2,504.30. The balance is still at issue.

Burton testified that a $9.23 expense was "Probably * * * a tank of gas that went into a rental car." (Emphasis added.) Some of the charges were incurred in Corvallis, Oregon, where Burton's son was attending college.[62] Finally, expenses were incurred by Pastor Nelson with respect to the performance of memorial services on behalf of Esther. Burton testified that these expenses were allocated to ERG because his mother was a director of ERG. After respondent presented evidence supporting his contention that these items constituted constructive dividends, with the exception of Burton's self-serving testimony,

---

[62]Burton testified that these expenses were incurred on a visit to a Hewlett Packard laser and jet ink printer division. He did not explain what that visit had to do with ERG's business.

petitioners fail to demonstrate a business purpose for any of these expenditures and otherwise fail to substantiate any of the items. Furthermore, expenses for Esther's memorial services are clearly personal and noncorporate expenses. Accordingly, we find and hold that Burton had constructive dividend income of $3,889.[63]

12. Legal Expenses

In 1994, ERG paid legal expenses of $4,660.19. Respondent determined that $4,159 constituted a constructive dividend to Burton.[64] The stipulated invoices provide some explanation of the nature of the charges incurred.

Although we generally agree with respondent, the face of the invoices grant the Bensons some relief. For example, $126 in

---

[63]Respondent appears to have double-counted a charge of $223.82. In his opening brief, respondent lists the amount still at issue as $6,690. Apparently, this amount is the aggregate of those items listed on the ERG travel expense report dated Feb. 9, 1994, $616.47, the expense report dated Oct. 4, 1994, $833.06, and the amounts the parties stipulated totaling $5,241.24. However, the amount $223.82 concerning a charge at a hotel in Corvallis, Oregon, is listed twice. Thus, an amount equal to $223.82 should be backed out of respondent's determination. Thus, we calculate Burton's constructive dividend as follows: $6,690 less $2,576.94 of substantiated expenses less $223.82.

[64]We are unable to resolve the apparent discrepancy between the amount listed in the notice of deficiency and the amount shown on the documentary evidence. Similarly, respondent asked us to find as fact that in 1994 ERG paid legal bills of $4,159. Without an explanation to the contrary, we assume that respondent has conceded the difference.

legal fees[65] was incurred concerning unemployment issues. Presumably, these were not personal expenses. However, for the majority of the charges detailed, it is either impossible to determine the purpose of the charges or those charges do not appear to be deductible expenses of ERG. For example, there are charges concerning a property line dispute and loan agreement and "MVPC documents". These could be either personal or business expenses since both ERG and the Bensons donated money to MVPC for which charitable deductions were claimed. Additionally, there are charges relating to probating Esther's estate, which would not appear to be ERG's deductible expense. Petitioners have failed to meet their burden of proof as to these items except for $126. Accordingly, we hold that Burton has constructive dividend income of $4,033.[66]

13. Employee Relations Expenses

Respondent determined that the Bensons received certain amounts paid by ERG designated as business relations expenses. On brief, respondent's only argument is that the Bensons failed to overcome the presumption of correctness in the notice of deficiency as to this issue. The amount of income determined by respondent is $4,027, but the invoices in evidence total $3,035.16. See supra p. 30. The Bensons failed to overcome the

---

[65]That is $210 per hour multiplied by .6 of an hour.

[66]That is $4,159 less $126.

presumption of correctness with respect to $3,035.16.  We hold

that $3,035 was a constructive dividend.

Use of Funds From NPI

The Bensons used proceeds from the above-listed transfers

for their personal benefit.  For example, from 1993 through 1995,

Burton caused NPI to expend more than $4.6 million for his

family's personal benefit.[67]  These funds were used for, inter

alia, the Bensons' personal State and Federal income tax

liabilities, personal investments, and transfers to their three

sons.  There is no indication in the record that the Bensons

intended to repay any part of these expenditures and/or transfers

---

[67]NPI made the following transfers on behalf of the Bensons:

| Transfer Year | Description | Amount |
|---|---|---|
| 1993 | California Franchise Tax Board | $129,480.00 |
| 1993 | IRS | 378,000.00 |
| 1994 | California Franchise Tax Board | 28,745.00 |
| 1994 | IRS | 135,869.00 |
| 1994 | Checks payable to Burton | 200,000.00 |
| 1994 | Wire transfer re secured promissory note | 1,000,000.00 |
| 1995 | IRS | 23,331.00 |
| 1995 | Checks payable to Burton and Elizabeth | 400,000.00 |
| 1995 | Burton's Jack White & Co. investment account | 1,000,000.00 |
| 1995 | Bensons' USAA Mutual Fund | 1,000,000.00 |
| 1995 | Bensons' Insight Capital Research & Management, Inc. account | 5,441.55 |
| 1995 | Bensons' Insight Capital Research & Management, Inc. account | 4,860.81 |
| 1995 | Checks payable to Eric, Brad, and Mark | 300,000.00 |
| Total | | 4,605,727.36 |

to NPI.  See Noble v. Commissioner, 368 F.2d at 443; Truesdell v. Commissioner, 89 T.C. 1280 (1987).  Nor is there any indication that any of the transfers served NPI's business purpose.  Additionally, as detailed above, ERG made significant payments to third parties, family members, and the Bensons themselves.  ERG paid the Benson family's personal expenses and purchased real property for their sole use and enjoyment.

We disagree with the Bensons that a finding of constructive dividends necessitates a declaration that NPI is a sham entity.  We do not find that NPI was a sham; however, we do find that there is competent evidence that transfers by ERG to NPI for purported royalties and engineering services during the years at issue were made by Burton for his personal benefit and lacked a business purpose.  Indeed, the record discloses that NPI was a receptacle to which ERG transferred and pooled its operational profits.  The exclusive licensing agreement and the payment of engineering services were the articulated justification for these payments.  As the testimony and evidence demonstrates, there was a "plan" to keep ERG profits static, shuttling amounts in excess thereof to NPI, clothed as business payments.  The profit level of ERG was not a function of economic realities but instead of tax planning and tinkering.

The record demonstrates that Burton controlled both sides of the equation; there were no arm's-length transactions between the

two entities.  There is no evidence upon which we can find that the transfers of funds by ERG to NPI served any business purpose. The Bensons substantially benefited economically from those transfers through NPI's disbursement of millions of dollars for the Benson family's personal use and enjoyment.  Accordingly, we find the Bensons enjoyed considerable economic benefits from the ERG transfers and expenditures.

Nonconstructive Dividend Issues

    1.  Franklin Dividends

The Bensons conceded that they had additional, unreported dividend income from their Franklin account #1 for all the years at issue except 1994.  In 1994, $1,072 was credited as dividends to this account.  The stipulated evidence demonstrates that the account was held in the Bensons' name, although the account bore the Social Security number of Eric.  All the funds deposited into this account are attributable to the Bensons.  Despite the fact that Eric reported the amount credited on his 1994 return, the dividends are clearly attributable to the Bensons and should have been reported by them.  Thus, we find and hold that the Bensons had additional dividend income in 1994 of $1,072.

    2.  Forgiveness of Debt Income

On its returns, ERG's "loans to stockholders/officers" were reduced from $88,291 in 1987 to $0 in 1988.  Respondent argues that the forgiveness of the debt was income to the Bensons in

1994, or, alternatively, in 1988.  We agree and sustain respondent's determination that the Bensons' debt was forgiven in 1994.  "Income from discharge of indebtedness" is included within the broad definition of income.  See sec. 61(a)(12).  "The underlying rationale for such inclusion is that to the extent a taxpayer is released from indebtedness, he or she realizes an accession to income due to the freeing of assets previously offset by the liability."  Jelle v. Commissioner, 116 T.C. 63, 67 (2001) (citing United States v. Kirby Lumber Co., 284 U.S. 1, 3 (1931)).  In July 1994, Bradac stated to Burton that without an explanation such unpaid loans constituted income in the year the indebtedness was discharged.  ERG filed its 1988 tax return on August 1, 1994.  Burton's indebtedness was discharged in 1994 when it was eliminated from ERG's return.  It was at that "'moment it * * * [became] clear that a debt will never have to be paid, such debt must be viewed as having been discharged.'" Rinehart v. Commissioner, T.C. Memo. 2002-71 (quoting Cozzi v. Commissioner, 88 T.C. 435, 445 (1987)).  Accordingly, we find and hold that Burton had cancellation of indebtedness income of $88,291 in 1994.

3.  Partner Expenses--Baden Spiel Haus Partnership

Burton was a 25-percent partner in the Baden Spiel Haus partnership, which owned and operated a ski cabin in California. Respondent determined that the Bensons were not entitled to

deductions for partner expenses claimed on their returns.  The
Bensons conceded the issue for the years 1989, 1990, and 1993,
but not for 1994.  The Bensons failed to substantiate any item of
expense.  Accordingly, we sustain respondent's determination as
to 1994.

4.  Rental Income/Loss--Residential Rental Expenses:

Respondent determined that the Bensons were not entitled to
unsubstantiated residential rental expenses of $23,599, $22,951,
$28,621, $23,737, and $23,599 for 1988, 1989, 1990, 1993, and
1994, respectively.  The deductions were claimed by NPI and
passed through to its shareholders.  The Bensons did not provide
the Court with evidence to substantiate the deductions claimed.
Accordingly, we sustain respondent's determination on this issue.

5.  Passive Loss Limitation

Respondent determined that rental losses reported on Eric's,
Brad's, and Mark's returns are subject to the passive loss
limitations contained in section 469.  Petitioners offer no
evidence with which we can find that they fall within the
auspices of any of the exceptions articulated in the
regulations.[68]  See Kessler v. Commissioner, T.C. Memo. 2003-185;
sec. 1.469-1T(e)(3)(ii)(A) through (F), Temporary Income Tax
Regs., 53 Fed. Reg. 5702 (Feb. 25, 1988).  Without a finding that

---

[68]On brief, petitioners state: "Petitioners do not dispute
respondent's argument on the applicable Subchapter S rules at
page 136-38 of his brief."

petitioners fall within one of those enunciated exceptions, "material participation" is irrelevant.  See sec. 469(c)(1); Tarakci v. Commissioner, T.C. Memo. 2000-358; Welch v. Commissioner, T.C. Memo. 1998-310 ("If * * * [taxpayer] establishes that the activity was not a rental activity, he then must establish that he materially participated in the activity to avoid the proscription of section 469.").  Accordingly, we sustain respondent's determination on this issue.

6.  NPI Distributions

On its 1994 return, NPI reported total property distributions other than dividends of $1,017,373.  Eric's, Brad's, and Mark's shares thereof were $169,562 each.  In the notice of deficiency, respondent determined that Eric had substantiated a basis in his NPI stock of $105,224 and that he had distributions in excess of basis of $64,338.  In the notices of deficiency for Brad and Mark, respondent determined that they had substantiated bases in their NPI stock of $76,926 each and, thus, had distributions in excess of basis of $92,636.

The parties indicate on brief that the issue concerning what amounts are properly reportable on Eric's, Brad's, and Mark's returns can be resolved by the parties under their Rule 155 computation.

Fraud Penalty

In his determinations, respondent asserted fraud penalties. Although the record discloses what could be construed as "badges of fraud," see Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601, we are not convinced that respondent has carried his heavy burden of proving fraud by clear and convincing evidence, Gow v. Commissioner, T.C. Memo. 2000-93 ("even where there is a strong suspicion of an intent to evade taxes, we are hesitant to impose the section 6663(a) penalty unless we are convinced that the Commissioner satisfied his burden of proof"). The record contains evidence that the inaccuracies and the inconsistencies in petitioners' returns may have been a result of extraordinary circumstances, albeit many times at the hands of Burton himself. For example, petitioners' long-time accountant and return preparer died just prior to the years at issue. A new accountant/return preparer was engaged years later and inherited a poorly administered accounting system. There were few records from which the financial history of the entities could be reconstructed. Apparently, a significant amount of work was performed to get the books and records of the entities in a position from which returns could be filed. Some of the returns were filed out of order, and amended returns were filed as additional information was discovered.

Clearly, ERG transferred millions of dollars to NPI. In reviewing and reconstructing the books and records of the entities, the accountants inquired as to these transfers. Burton and the accountants labeled these transfers as payments of royalties and for engineering services. The royalties were paid on the basis of an exclusive licensing agreement suggested by Miller, the mediator of the brothers' dispute. The balances were designated "engineering services" by Burton and his accountants.

When asked at trial who came up with the idea of how to allocate income between NPI and ERG, Bradac testified "Probably through my suggestion in the early years we were trying to base it on the income of ERG and we started with a number, somewhere an average of fifty to seventy-five thousand dollars of profits for the corporation." That number was based upon Bradac's suggestion because "the tax rates for a corporation * * * [become] rather prohibitive after 75,000, and also looking at perhaps the balance sheets and estimating the growth of the company over those years." Bradac admitted at trial that "any plan developed by * * * [Burton], was developed with my consultation." For example, Bradac knew that the $483,098 that ERG transferred to NPI was not for equipment purchased and, instead, he claimed a royalty deduction in preparing the ERG returns for 1989 of $252,679 explaining: "I believe it was an unfortunate tag, meaning the royalty name". He stated: "And I

was focused on royalties as a possible deduction from ERG to * *

* NPI and we put the amount in there when it probably should have

been better labeled services * * * so we deducted the amount as

royalties when perhaps a better label even then would have been

engineering services." According to Bradac's testimony, there

was no real formula to allocate royalties to the years at issue.

The Court asked and Bradac answered as follows:

> Q: How were the specific amounts arrived at for
> the individual years?
>
> A: We would--we initially, one based it on the
> profits of ERG. And when I say that, we anticipated
> that ERG would still be profitable during the period.
> So we estimated their profits in the range of fifty to
> seventy-five thousand dollars. And calculated the
> royalties that were necessary to bring the income down
> to that level.

Additionally, Bradac testified that he suggested the concept of

constructive receipt as a basis to allocate payments to tax years

prior to receipt. Bradac, Toibin, and Burton discussed the

characterization of other ERG payments to NPI as "engineering

services". Finally, Bradac testified that Burton did not order

him to make any particular entry that appeared on the returns and

that he made discretionary decisions with respect to classifying

income and expense.

Given this record, we are unable to sustain respondent's

determination of fraud.

Accuracy-Related Penalties

With respect to the Bensons,[69] respondent determined that to the extent we do not find fraud, we should impose accuracy-related penalties.[70]  Additionally, respondent determined accuracy-related penalties for Eric, Brad, and Mark for 1994. Respondent based his determinations on negligence or disregard of the tax rules and regulations and/or a substantial understatement of income tax.  Respondent's determinations are presumed correct, and the burden lies with petitioners to demonstrate that respondent's penalty determinations were in error.[71]  Rule 142(a).

Section 6662(a) imposes a 20-percent penalty on the portion of an underpayment of tax attributable to, inter alia, negligence and/or a substantial understatement of income tax.  Sec. 6662(a) and (b).  "Underpayment" is defined as the amount by which any tax imposed exceeds the excess of the sum of the amount shown by the taxpayer on his return plus the amounts not so shown

---

[69]Respondent also determined, as an alternate to the fraud penalty which he conceded shall not apply to Eric, an accuracy-related penalty for Eric's 1993 tax year.  See docket No. 585-98. However, on brief, respondent explains that the penalty is affected by our holding on the issue of constructive dividends.

[70]In fact, respondent's alternative position for 1989, 1990, 1993, and 1994 is based upon sec. 6662(a).

[71]Sec. 7491(c) does not apply in this case.  See supra note 41.

previously assessed (or collected without assessment) over the amount of rebates made.  Sec. 6664(a).

"Negligence" is defined as "any failure to make a reasonable attempt to comply with the provisions of this title" and "disregard" means "any careless, reckless, or intentional disregard."  Sec. 6662(c).  Similarly, caselaw defines negligence as a lack of due care or "'the failure to do what a reasonable and ordinarily prudent person would do under the circumstances.'" Freytag v. Commissioner, 89 T.C. 849, 887 (1987) (quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. on this issue 43 T.C. 168 (1964) and T.C. Memo. 1964-299)), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991). Pursuant to the regulations, "'Negligence' also includes any failure by the taxpayer to keep adequate books and records or to substantiate items properly."  Sec. 1.6662-3(b)(1), Income Tax Regs.

Section 6664(c) provides an exception to the penalty imposed under section 6662(a).  "No penalty shall be imposed under this part with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion." Sec. 6664(c)(1).  The determination of whether the taxpayer acted with reasonable cause and in good faith is made on a case-by-case

basis, contemplating all the relevant facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs.

"Reasonable cause requires that the taxpayer exercise ordinary business care and prudence". Bitker v. Commissioner, T.C. Memo. 2003-209 (citing United States v. Boyle, 469 U.S. 241 (1985)). With respect to the tax treatment of an item, the good faith reliance on the advice of a competent and independent professional may constitute "reasonable cause". Id.; sec. 1.6664-4(b), Income Tax Regs. However, whether a taxpayer reasonably relies on the advice of a professional depends upon the facts and circumstances of the case and the applicable law. Sec. 1.6664-4(c)(1)(i), Income Tax Regs. "[T]he ultimate responsibility for a correct return lies with the taxpayer who must furnish the necessary information to his agent who prepared his return." Pessin v. Commissioner, 59 T.C. 473, 489 (1972); sec. 1.6664-4(c)(1)(i), Income Tax Regs. The taxpayer "has the burden of establishing that he at least supplied the correct information to his accountant * * * and that the incorrect returns were a result of the accountant's mistakes." Pessin v. Commissioner, supra at 489.

In this case, the understatement and underpayment of tax is a direct result of the misapplication and mislabeling of transactions in derogation of the tax laws. Furthermore, Burton's failure to keep accurate and complete corporate books

significantly contributed to his failure to accurately and completely report income and file returns.[72]

The record is replete with indications that Burton did not supply complete and/or correct information to his return preparers.  He cannot hide behind the shield of ignorance or reliance.  Indeed, both Bradac and Toibin testified repeatedly that they relied in large part on Burton's representations and characterizations.  For example, Bradac testified that with respect to the automobile and truck deductions, he relied completely on Burton's representations that the correct allocation between personal and business use was made.  Additionally, Bradac testified that he had not seen a copy of the royalty agreement before he commenced preparation of ERG's and NPI's returns.  We sustain respondent's determination of negligence penalties in this case against the Bensons.

Likewise, petitioners argue on brief that "Burton testified he was responsible for getting his son's returns completed and filed for 1993 and 1994, and * * * accuracy related penalties should not inure to the sons for what the father undertook to do."  We disagree.  "[T]he taxpayer must bear the consequences of any negligent errors committed by its agent."  Ellwest Stereo Theater v. Commissioner, T.C. Memo. 1995-610 (citing Logan Lumber

---

[72]On brief, petitioners argue:  "there is no question that Burton neglected his responsibilities to enlist new accounting help and to keep up with required tax return filings."

Co. v. Commissioner, 365 F.2d 846, 854 (5th Cir. 1966), affg.

T.C. Memo. 1964-126).  Thus, we sustain respondent's

determinations of accuracy-related penalties as to Eric, Brad,

and Mark.

Additions to Tax--Failure To File Timely Return

Pursuant to section 6651(a)(1), respondent determined that

the Bensons are liable for additions to tax for 1989 and 1990 and

that Eric is liable for additions to tax for 1993.[73]  An addition

to tax is imposed under section 6651 for the failure to file a

return within the period prescribed, unless the taxpayer shows

that such failure was due to reasonable cause and not due to

willful neglect.  Sec. 6651(a)(1).  The amount of the addition is

5 percent of the amount required to be shown as tax for each

month that the delinquency persists, up to a maximum of 25

percent.  Id.

The delinquency is due to reasonable cause if the taxpayer

exercised ordinary business care and prudence but was

nevertheless unable to perform his tax obligations in a timely

manner.  Brewery, Inc. v. United States, 33 F.3d 589, 592 (6th

Cir. 1994); Housden v. Commissioner, T.C. Memo. 1992-91.

---

[73]According to the notice of deficiency, Eric's delinquency
addition to tax is a result of an invalid extension.  Since he
did not properly estimate his tax liabilities on his extension
application and since he failed to show a reasonable attempt to
secure the information necessary to make the estimate, his
extension was considered invalid.

However, "The delinquency is due to willful neglect if it resulted from a conscious decision or from reckless indifference." Ellwest Stereo Theater v. Commissioner, supra (citing United States v. Boyle, supra at 245).

The Bensons offered no evidence or excuse for their failure to file timely returns, and we conclude that they have not shown that their failure to file returns for the years at issue was due to reasonable cause and not due to willful neglect. Accordingly, we sustain respondent's determinations.

Furthermore, petitioners argue on brief that since Burton testified that he was responsible for filing his son's returns, the additions to tax "should not inure to the sons for what the father undertook to do." Petitioners cite no authority upon which we can look to relieve Eric from his duty to file his tax return timely. They rely solely upon Burton's testimony that he undertook the responsibility to file his children's returns.

> Where the duty to file the return is imposed on the guardian charged with the care of the taxpayer's property, and not on the taxpayer, the inability of the taxpayer is not controlling, and the applicability of additions to tax depends on whether or not there was a lack of good cause and due care on the part of the guardian.

Bassett v. Commissioner, 67 F.3d 29, 32 (2d Cir. 1995), affg. 100 T.C. 650 (1993). We are not convinced that the failure to file was attributable to reasonable cause and not to willful neglect.

Thus, we sustain respondent's imposition of delinquency additions to tax as to Eric's 1993 tax year.

<u>Decisions will be entered under Rule 155</u>.

## Appendix
## Concessions of the Parties

1.  Respondent concedes that payments of $6,000 made in 1989, 1990, and 1993, and $13,500 in 1994, by Energy Research & Generation, Inc. (ERG), to Moraga Valley Presbyterian Church (MVPC) are not constructive dividends to Burton Benson (Burton).[74]

2.  Respondent concedes that the following payments that ERG made for the years listed are not constructive dividends to Burton:

| Year | Check No. | Amount |
|------|-----------|--------|
| 1988 | 19378 | $10,000 |
| 1988 | 18617 | 10,000 |
| 1989 | 20021 | 33,328 |
| 1990 | 21166 | 2,610 |

Respondent concedes that Burton O. and Elizabeth C. Benson (the Bensons) are not liable for constructive dividends with respect to the category "other payments" that ERG made of $5,700 for 1990.

3.  Respondent concedes that a payment that ERG made in 1993 for medical expense of $4,000 is not a constructive dividend to Burton.

---

[74]In the text of respondent's opening brief, he states the amount conceded as $13,500.  However, he also states the amount as $15,500.  We assume from the parties concessions and the record that respondent conceded $13,500 paid to MVPC and $2,000 to Camp Timberlake.

4. Burton concedes that he had constructive dividend income with respect to payments that ERG made for automobile expenses in the following amounts:

| Year | Amount |
|------|--------|
| 1990 | $15,000 |
| 1993 | 13,500 |

5. Burton concedes that he had constructive dividend income with respect to payments that ERG made for life insurance for the years and in the amounts listed:

| Year | Amount |
|------|--------|
| 1988 | $2,425 |
| 1989 | 2,404 |
| 1990 | 2,480 |
| 1994 | 4,781 |

Respondent concedes the adjustment of $2,646 for 1993.

6. Burton concedes that he had constructive dividend income with respect to payments that ERG made in 1993 and 1994 for Eric Benson's (Eric) education of $2,599 and $9,166, respectively.

7. Burton concedes that he had constructive dividend income with respect to funds withdrawn from the ERG-Recreation fund bank account(s) for the years and in the amounts listed:

| Year | Amount |
|------|--------|
| 1988 | $3,000 |
| 1990 | 686 |
| 1993 | 18,556 |

The amount conceded for 1993 includes $9,000 from cashing check No. 27 dated March 8, 1993, payable to ERG. It also includes

check No. 30 drawn on the ERG-Recreation fund account payable to Mark Benson (Mark) for $9,000.  However, the balance for 1993, $8,000, remains at issue as well as the entire amount for 1994.

8.  Respondent concedes that a payment made from the ERG-Ford Retirement Fund in 1990 of $26,000 is not income to the Bensons.  Respondent also concedes that the Bensons are not liable for the 10-percent penalty pursuant to section 72 of $2,600 for 1990.

9.  The Bensons concede that they had additional royalty income from Form 1099 sources in the years and amounts listed:

| Year | Amount |
|------|--------|
| 1988 | $883 |
| 1989 | 709 |
| 1993 | 570 |
| 1994 | 586 |

10.  The Bensons concede that they had additional dividend income from Franklin Money Fund accounts for the years, for the accounts, and in the amounts listed:

| Account No. | 1988 | 1989 | 1990 | 1993 |
|-------------|------|------|------|------|
| 11102309431 | $204.36 | $192.66 | $229.39 | $360.04 |
| 11100025476 | -0- | -0- | 461.69 | 627.07 |

11.  The Bensons are not entitled to the dependency exemptions claimed for Esther Benson (Esther) for 1988, 1989, and 1990.

12.  The Bensons are not entitled to itemized deductions for mortgage interest in excess of the amounts allowed by respondent

in the notices of deficiency for tax years 1988, 1989, 1990, and 1993.

13. The Bensons are not entitled to deductions for partner expenses with respect to the Baden Spiel Haus partnership for the years and in the amounts listed:

| Year | Amount |
| --- | --- |
| 1989 | $1,281 |
| 1990 | 1,182 |
| 1993 | 1,473 |

14. For 1993, Eric had additional: (1) Capital gain income of $1,957; (2) dividend income of $565; and (3) interest income of $121.

15. Respondent concedes that Eric and Elizabeth Benson (Elizabeth) are not liable for civil fraud penalties for the years at issue.

16. For 1994, Brad Benson (Brad) had additional: (1) Capital gain income of $2,444; (2) dividend income of $2,779; and (3) interest income of $65.

17. For 1994, Mark had additional: (1) Capital gain income of $2,542; (2) dividend income of $11,674; (3) income from ERG of $5,000; and (4) self-employment income with respect to the amounts received from ERG.

18. For 1994, Eric had additional: (1) Capital gain income of $2,443; (2) dividend income of $2,822; (3) interest income of $112; (3) gross wage income of $232; and (4) self-employment

income with respect to the amounts received from ERG and reported on his 1994 return as "other income".

19. Respondent concedes that the Bensons did not have constructive dividend income in 1994 with respect to payments that ERG made for travel expense for $536.

20. Respondent concedes his alternative position that the fair market value of rent on the Stanford plant was as determined by an expert appraiser whose report respondent submitted to the Court.

21. Respondent concedes ERG's computer purchase in the amount of $3,847 did not constitute a constructive dividend to the Bensons in 1993.

22. Respondent concedes that ERG's payment of $692 for health insurance coverage for Esther did not constitute a constructive dividend to the Bensons in 1994.

23. Respondent concedes that if the Court determines that the Bensons received constructive dividends of $96,749 from ERG's payment of legal expenses, the Bensons are entitled to deduct legal expenses (subject to the limitations in section 67) of $77,973 for 1989.

24. For the years 1988, 1989, 1990, 1993, and 1994 to the extent that the Court determines constructive dividends, these amounts are taxed as dividends to the Bensons.

25. The parties agree that if respondent prevails on the constructive dividend issue, then the income reported by the other shareholders of New Process Industries, Inc., will have to be accordingly adjusted.